OPINION OF THE COURT
Mary Ellen Fitzmaurice, J.
On October 29, 1982, petitioner Anne R, an unmarried woman, gave birth to Megan R. Ten years later, Anne R. filed a petition alleging that Francis C., who was deceased, was the father of Megan and requesting that the court enter a posthumous order of filiation. Determining that no letters of administration had been issued and further finding that decedent’s widow would be in the best position to contest petitioner’s application (Matter of Henry v Rodd, 95 Misc 2d 996), the court ordered that the proceeding be brought against Mrs. C.
Petitioner further requested that the court order genetic blood marker tests on Francis C.’s frozen blood samples. Francis C. had been shot to death on March 27, 1992 while working as a security guard in Suffolk County. The Suffolk County Medical Examiner’s Office had drawn and frozen blood samples from Francis C. as they routinely do when they encounter homicide victims.
At that point the case presented the court with two questions: (1) did petitioner have standing to institute the paternity proceeding; (2) can deoxyribonucleic acid (DNA) tests performed on the decedent’s frozen blood samples be admitted into evidence? The court ruled affirmatively on both questions.
*345 The question of whether petitioner has standing to commence a postdeath proceeding is addressed by Family Court Act § 519 which reads:
"If, at any time before or after a petition is filed, the putative father dies, or becomes mentally ill or cannot be found within the state, neither the proceeding nor the right to commence the proceeding shall necessarily abate but may be commenced or continued by any of the persons authorized by this article to commence a paternity proceeding where:
"(a) the putative father was the petitioner in the paternity proceeding; or,
"(b) the putative father acknowledged paternity of the child in open court; or,
"(c) a blood genetic marker test had been administered to the putative father prior to death; or,
"(d) the putative father has openly and notoriously acknowledged the child as his own.”
Clearly, subdivision (c) specifically grants authority to commence a paternity proceeding when "a blood genetic marker test had been administered to the putative father prior to his death” (emphasis added). Since Family Court is a statutory court and its powers are limited to those specifically granted by statute (Matter of Corbett v Corbett, 100 Misc 2d 270, affd sub nom. Mary Ellen C. v Joseph William C., 79 AD2d 1024), the court could not order a postdeath DNA test to give petitioner standing to commence the proceeding. After reviewing the memoranda of law submitted by both parties, as well as the legislative history of the statute, the court realized that the petitioner’s best course of action toward establishing paternity would be to pursue such a claim under Family Court Act § 519 (d). However, before this theory could be considered the petitioner bore the burden of presenting evidence of open and notorious acknowledgement of paternity as this finding of fact is necessary in order to reach the issues presented under Family Court Act § 519 (d) and to show the existence and extent of decedent’s alleged acknowledgement of paternity.
On October 28, 1993 the court conducted a pretrial hearing solely to determine whether petitioner had standing to institute the proceeding or whether the proceeding had been abated by decedent’s untimely death.
Petitioner called Father John B. of St. Bartholomew’s parish. He credibly testified that Megan had been baptized at the hospital because she had been born prematurely, and that *346 during a subsequent church ceremony, on April 20, 1990, the decedent introduced himself as Megan’s father and in fact stood where the father stands during the ceremony. The decedent was also present at Megan’s communion. The court found that petitioner had proven that decedent had acknowledged paternity openly and notoriously by a fair preponderance of the evidence and that this was sufficient for instituting the proceeding. However, the court held such scant testimony did not rise to the level of proving paternity by clear, convincing and satisfactory proof and that paternity was not established to the point of entire satisfaction (Matter of Dorn "HH” v Lawrence "II”, 31 NY2d 154, appeal dismissed sub nom. Fuchs v Silvester, 409 US 1121; Matter of Janet K. v Joseph M., 89 AD2d 870) the standard in New York State. Petitioner was given an opportunity to present her case.
This brought the court to the second question: Can DNA tests performed on decedent’s frozen blood samples be admitted into evidence?
Family Court Act § 532 addresses the question of admissibility of blood genetic marker tests in paternity proceedings. At the time petitioner’s application for blood genetic tests was made, DNA evidence alone was not admissible to establish paternity but had to be submitted "in combination with” HLA evidence (Family Ct Act § 532 [a]; Matter of Department of Social Servs. [Debra L.] v William J., 191 AD2d 558). The court was advised that HLA testing could not be successfully performed on the frozen blood samples.
Decedent’s widow did not oppose petitioner’s application for an order permitting DNA testing of decedent’s blood samples stored by the Suffolk County Medical Examiner’s Office since the results could possibly exclude the decedent. The court did order DNA testing on decedent’s frozen blood samples, intending to admit it as evidence only if it excluded the alleged father. (Matter of Department of Social Servs. [Sandra C.] v Thomas J. S, 100 AD2d 119.)
Because this was the first time in New York State where an order for DNA testing had been made under these circumstances, it took many months for Roche Biomedical Laboratories, a certified lab, to coordinate the drawing, transporting and analyzing of the parties’ blood. On August 26, 1994 the results were received by this court indicating the probability of paternity at 96.61%.
During the pendency of the matter and before the hearing was commenced, the Legislature amended Family Court *347 Act §§ 418, 532 (a) and (b) and CPLR 4518 (e) authorizing DNA testing in paternity proceedings (L 1994, ch 170, §§ 350, 352, 354). The effective date of the amendment was June 15, 1994. Since rules governing admissibility of evidence are procedural and may be applied to cases currently pending in the court (McKinney’s Cons Laws of NY, Book 1, Statutes § 55; Matter of Gregory F. W. v Lori Anne B., 162 Misc 2d 411; Matter of Hrouda v Winne, 112 AD2d 304; Barber v Davis, 120 AD2d 364). The DNA evidence was admissible when the matter was tried.
At the paternity trial, respondent asserted that the results of the DNA test were inadmissable because they had been conducted after Francis C.’s death. Respondent relied on Surrogate Roth’s decision in Matter of Janis (157 Misc 2d 999). The case at bar is distinguished from Janis in that the issue before Surrogate Roth was whether EPTL 4-1.2 (a) (2) allowed a nonmarital child to exhume decedent’s body for purposes of establishing standing to contest the admission of a will into probate. Surrogate Roth examined EPTL 4-1.2 (a) (2), the law governing exhumations along with subdivision (d) of Family Court Act § 519 and concluded that the nonmarital child had "not established entitlement to exhumation” (Matter of Janis, 157 Misc 2d 999, 1003, supra).
In the instant matter, petitioner had already established, at a hearing, standing to bring the action pursuant to subdivision (d) of Family Court Act § 519. Nothing in Family Court Act § 532 prohibits admission of postdeath blood results into evidence. Indeed, the Appellate Division, First Department, confirming Surrogate Roth’s decision (Matter of Janis, 210 AD2d 101), wrote "[a]nd even if the statute (EPTL 4-1.2 [a] [2]) did contemplate post-death [blood] testing, the request for exhumation was unreasonable as a matter of law”. This left the issue of postdeath testing open under more reasonable circumstances. In this case decedent’s blood was already drawn and available; therefore ordering postdeath DNA tests was not unreasonable.
After numerous consent adjournments the matter was heard on April 19, 1995, April 20, 1995 and May 8, 1995. All parties were represented by counsel and the child was appointed a Law Guardian. The court credits the testimony of all witnesses. The following are the court’s findings of facts and conclusions of law.
*348 FINDINGS OF FACT
Petitioner and decedent began their affair in 1980. This relationship included double dates with Geraldine and Ernesto N. to various restaurants in Queens. The extramarital relationship thrived mostly due to Anne R.’s discretion which enabled the decedent to truly live a double life. Indeed, the most compelling and disturbing testimony in the case came from decedent’s marital son, Steven, who credibly testified to his rich family life surrounded by his loving parents during many holiday and birthday celebrations. The discovery of decedent’s extramarital affair was a shock to Steven and his family. The court notes that during the first seven years of his relationship with Anne R., Francis C. was a New York City police officer; and the court further notes police schedules are irregular and unusual. Francis C. also had a milk delivery route. Both these occupations left Francis C. with the opportunity to keep company with petitioner a minimum of once or twice a month without raising suspicion at home. Anne R. and Francis C. had sexual relations during the critical period. Anne R. credibly testified that no one else had access as Francis C. was her only lover. No proof was offered to the contrary.
When Anne R. became pregnant it was Francis C. who revealed the news to Anne R.’s son Brian by stating "your mother and I are going to have a child.” Francis C. chose Megan’s godfather prior to her birth by asking Ernesto N. "will you be the godfather to my child?” In September 1982, after a baby shower in honor of Anne R. concluded, Francis C. arrived and thanked everyone for the gifts, hugged and kissed the guests and packed up the gifts into his car. Francis C. also rushed to the hospital when Anne R. had complications with the pregnancy that caused her to give birth prematurely. Once at the hospital it was Francis C. who took charge of the situation. He spoke to the nurses, and was the only one allowed into the pediatric intensive care section, a place traditionally reserved only for parents. Once Megan was born, Francis C. was present at petitioner’s home for each and every birthday party. At these parties, Megan sat on Francis C.’s lap, and called him "daddy”. Francis C. also helped Megan blow out the candles on her cake. Numerous photographs were submitted into evidence depicting these happy scenes. Francis C. frequently commented at these gatherings, "Isn’t my daughter getting big?” or "Who do you think she looks like?” In contrast, Anne R.’s son, Brian, who was also present, called Francis C. "Frank” and Francis C. never referred to him as "my son”.
*349 Francis C. gave money towards Megan’s support. When he could not come in to visit he would leave the money in the mailbox, an event which was witnessed by Anne R.’s next door neighbor Diana R. Numerous cards were submitted into evidence addressed to Megan and signed "daddy” by Francis C.
In sum, Francis C. behaved like a doting father towards Megan. It is uncontroverted that Francis C. never introduced Megan to his family including his wife, sons or mother. Francis C. made no written provisions for Megan in the event of his death and no photographs of Megan were found on his person. The court takes no negative inference from these facts as it is not unusual that a married man would have chosen to keep silent as to his extramarital affair. Anne R. was a coconspirator in silence throughout the relationship. This silence continued after Francis C.’s death, when Anne R. made arrangements for a private viewing of his body so as not to upset his family.
CONCLUSIONS OF LAW
Pursuant to Family Court Act § 532, as amended, a DNA test with the probability of paternity over 95% is presumptive proof of paternity. In the instant matter, respondents were given ample opportunity to make timely objections to the admissibility of the DNA evidence and to question the procedures associated with the DNA test as well as its validity. Respondents, for reasons that are not part of the record, chose not to do so. Instead, they solely relied on the fact that the tests were conducted posthumously and that this made them inadmissable. The court disagrees with respondent’s contention but finds that even without affording the DNA test results any weight, petitioner has met her burden by clear and convincing evidence and satisfactory proof that paternity was established to the point of entire satisfaction (Matter of Dorn "HH” v Lawrence "II”, supra) and further finds that Francis C. held himself openly and notoriously to be the father of Megan R.
Notwithstanding the foregoing, the court notes that the advances made in DNA testing as well as its acceptability in the legal and scientific community (People v Wesley, 83 NY2d 417) make it a useful tool in determining paternity in postdeath proceedings, particularly in cases where available evidence of paternity does not meet the requisite burden of proof. Indeed, recent developments in DNA technology make it possible for there to be DNA comparison of the blood of putative grandpar *350 ents with that of an infant in order to prove paternity (Matter of Sandler, 160 Misc 2d 955). However, as the Janis decision (210 AD2d 101, supra) points out, certain situations make obtaining DNA evidence "unreasonable”.
The existing statutes offer little guidance on how to utilize DNA evidence most effectively in postdeath proceedings. This results in numerous pretrial arguments which delay the case in chief. The court has three suggestions to the Legislature to help ameliorate this problem.
First, the Legislature should address Family Court Act § 519 (d) to determine whether it requires modification. This court found that a determination of "open and notorious” needed, at the outset, a separate fact-finding hearing and that standing be established, since this was a civil proceeding, by a fair preponderance of the evidence. The court further found the burden of proof in the issue of standing was unrelated to the burden of proof on the substantive issue of paternity, which is clear and convincing evidence (Property Clerk of N. Y. City Police Dept. v Ferris, 77 NY2d 428). Although the legislative history of this statute reveals that there was some concern regarding the ineffectiveness of Family Court Act § 519 (d), because it required a separate fact-finding hearing, the bill was approved without clarification.
Second, the Legislature should amend Family Court Act § 519 (d) and § 532 to specifically grant authority to conduct posthumous DNA tests on the motion of any party or the court. By liberalizing the statute in this manner, the Legislature could set specific parameters under which a moving party may prevail. The parameters could include: (1) what petitioner must prove to the court in order to establish standing under Family Court Act § 519 (d) (2) once standing is found, requiring the court to make a determination that ordering the postdeath DNA test is practicable and not unreasonable.
Third, the Legislature is urged to review all relevant provisions of postdeath paternity proceedings, including EPTL 4-1.2 (a) (2). Until such time as the Legislature acts, this area will be meshed in a quagmire of remedial and possibly conflicting judicial responses.
Based on the evidence adduced at trial the court finds by clear, convincing and satisfactory proof that decedent, Francis C., is the father of the child Megan R. and enters an order of filiation.