OPINION OF THE COURT
Renee R. Roth, S.
The novel issue in the estate of Delwyn Wilkins is whether *569 testator’s nonmarital son can inherit as a child born after the execution of Mr. Wilkins’ will.
Mr. Wilkins, who died on June 16, 1988, was survived by a brother and three sisters (all of whom live in Jamaica) as well as an alleged nonmarital child, Michael Minor. Under the propounded handwritten will dated January 29, 1965 (four years before the birth of Michael on June 28, 1969), decedent left his estate in varying percentages to his brother and sisters. Although it was expected that Michael would immediately move to establish his status as decedent’s son (Matter of Wilkins, NYLJ, July 16, 1990, at 25, col 2), it was not until January 1997 that he commenced a paternity proceeding in Family Court. Such proceeding was ultimately transferred to this court where a hearing was held. Two witnesses testified, decedent’s friend, McDonald Dent, and Michael’s mother, Mamie Minor. Several affidavits and various documents were also received in evidence to supplement their testimony.
Mr. Dent testified that he had first met decedent, who lived in New York, at a Christmas party in the Washington, D.C. home of Ms. Minor’s father. He thereafter saw decedent and Michael on holidays and during family celebrations, including Michael’s birthday and graduation parties, and at least once accompanied them to Saks Fifth Avenue where decedent bought clothes for Michael. He further testified that decedent always referred to Michael as his “son.”
Ms. Minor testified that she had first met decedent in 1960 when he and her brother were attending Howard University. In 1965, she married Raymond Minor, but left him early in 1966 after discovering that he may not have been divorced from his first wife. Shortly thereafter, Ms. Minor and decedent renewed their friendship. In late 1968, Ms. Minor learned thát she was pregnant. Since she had not had sexual relations with anyone other than decedent, Ms. Minor called him to report that she was pregnant with his child. Decedent asked her to move to New York and marry him if and when she was free to do so. But the idea apparently was ultimately doomed by her unwillingness to leave her job and his unwillingness to leave New York.
Michael was born on June 28, 1969. When a hospital employee requested information for the baby’s birth certificate, Ms. Minor — fearing that she might lose her job with the State Department if it became known that she had an out-of-wedlock child and wishing to protect the child from any future disgrace — falsely reported that her husband was the father.
*570 Ms. Minor testified that when Michael was a baby decedent stayed with them often. From the time Michael was six, he came to New York to visit decedent on Thanksgiving and during summer breaks. Decedent took Michael with him to Jamaica to celebrate weddings and holidays with decedent’s family, and Michael went to Jamaica on his own, spending entire summers in the home of decedent’s brother Donald.
With respect to the expenses of raising Michael, decedent provided for Michael’s clothes and education while Ms. Minor provided for his food and shelter. After Ms. Minor returned to work when Michael was about 14 months old, decedent paid for the baby’s day care. Decedent also paid for Michael’s tuition at a private school, from prekindergarten through high school, and periodically gave Ms. Minor a check for $200 or $300 to use in her discretion for Michael’s care.
The testimony of these witnesses was corroborated by documentary proof. For example, there are invoices from the private school attended by Michael, addressed to decedent in New York; a letter from decedent to Ms. Minor, dated November 24, 1987, ending with the words, “all the best to you and our son, sincerely, Delwyn”; a letter from decedent to Michael, dated November 16, 1987, when Michael was 18 years old and in college, addressed to “Dear son,” signed “Love, Dad” and enclosing a “check for $100”; and a Christmas card from decedent’s brother, Donald, to Michael, reading, “To My Dear Michael, love & best wishes. Fr: Uncle Donald, Aunt Lydia & family. We all long to see you.” Additionally, there are affidavits from one of decedent’s former neighbors and from the former handyman for his apartment building, describing occasions when decedent introduced each to his “son.”
Finally, although certainly not least, an affidavit from Raymond Minor confirms that he did not have sexual relations with Ms. Minor after 1966 and therefore could not be the father of her son.
With this background we turn to the governing law which provides that a nonmarital child may inherit from his father only if he satisfies the requirements of EPTL 4-1.2 (a) (2). In this case, where there was no order of filiation (EPTL 4-1.2 [a] [2] [A]) or duly filed acknowledgment of paternity (EPTL 4-1.2 [a] [2] [B]), the statute requires clear and convincing evidence of paternity and further evidence that the father has openly and notoriously acknowledged the child as his own (EPTL 4-1.2 [a] [2] [C]).
It is noted at the outset that — assuming the Minors’ marriage was not a nullity — Michael’s evidentiary burden is ad *571 ditionally weighted by the presumption of legitimacy, “one of the strongest and most persuasive known to the law” (Matter of Baby Girl S., 140 Misc 2d 299, 302; Matter of Findlay, 253 NY 1, 7; Commissioner of Pub. Welfare v Koehler, 284 NY 260). But such presumption may be rebutted by clear and convincing evidence to the contrary (Matter of Ludwig, 239 AD2d 122; Matter of Cheryl A. B. v Michael Anthony D., 209 AD2d 966; Ghaznavi v Gordon, 163 AD2d 194) including nonscientific evidence sufficient to overcome the presumption as wholly incompatible with reason and common sense, which is the case here (Matter of Findlay, supra; Matter of Joan G. v Robert W., 83 AD2d 838; Nass v Nass, 64 AD2d 852; Matter of Schenectady County Dept. of Social Servs. v Hilvan RR, 57 AD2d 688).
Based upon all the proof, the court concludes that Michael is decedent’s son and that decedent openly acknowledged his paternity. The proof further establishes that Michael is decedent’s sole distributee.
But the question remains as to whether Michael’s interest in the estate is nonetheless foreclosed by the will that decedent executed prior to Michael’s birth. In other words, must Michael successfully challenge probate in order to preserve his interest as a distributee or may he assert his status in another way?
The answer to that question turns on the statute governing the rights of an “after-born child” (EPTL 5-3.2), which applies to a will executed before the birth of a child of the testator. Where, as here, testator made no type of settlement for such child and had no living child at the time he executed the will, the after-born child “succeeds to the portion of such testator’s estate as would have passed to such child had the testator died intestate” (EPTL 5-3.2 [a] [2]), i.e., the entire estate (EPTL 4-1.1 [a] [3]).
It is noted that EPTL 5-3.2 is in essence an intent-enforcing statute purposed to provide for a child where testator himself would have done so but for oversight or lack of opportunity. It is also observed that, by effectively nullifying the will to the extent required to give the child his intestate share, the statute stands as a striking exception to the law’s strong disposition to avoid intestacy whenever possible (see, e.g., Matter of Bieley, 91 NY2d 520, 525; Matter of Dammann, 12 NY2d 500, 504-505; Schult v Moll, 132 NY 122, 125) and as such is a telling expression of this State’s public policy in this regard.
The issue thus is whether the statute’s reference to an “after-born” includes a nonmarital child who is entitled to an intestate share under the provisions of EPTL 4-1.2 (a) (2) (C).
*572 In two decisions construing EPTL 5-3.2 or its predecessor (former Decedent Estate Law § 26), the claims of after-born nonmarital children to inherit from their fathers were denied (Matter of Crawford, 64 Misc 2d 758; Matter of Tomacelli-Filomarino, 189 Misc 410). Those courts, however, had no other choice since the then-governing statutes entirely foreclosed inheritance from a father (former Decedent Estate Law § 26; Matter of Tomacelli-Filomarino, supra) or allowed such inheritance only if there was an order of filiation or the testator and the child’s mother had eventually married (EPTL 4-1.2 [as then in effect]; Matter of Crawford, supra).
But after these decisions the trend in the law began to recognize “changes in societal attitudes” (Matter of Hoffman, 53 AD2d 55, 57) demanding “abolition of] the unchosen birthgiven shackles of illegitimacy and * * * filial equality wherever possible” (Prudential Ins. Co. v Hernandez, 63 Misc 2d 1058, 1059), as reflected, for example, in the holding that a will’s reference to “issue” presumptively included illegitimates and legitimates alike (Matter of Hoffman, supra). In response, the Legislature, by degrees, liberalized the proof required to establish paternity for purposes of inheritance (L 1966, ch 952; amended L 1967, ch 686, §§ 28, 29; L 1979, ch 139, § 1; L 1981, ch 67, § 2; L 1987, ch 434, § 2; L 1992, ch 595, § 9; L 1994, ch 170, § 351).
It would appear to be consistent with this trend and with the precedents tying applicability of EPTL 5-3.2 (and its predecessor, former Decedent Estate Law § 26) to legitimation under EPTL 4-1.2 (and its predecessor, former Decedent Estate Law § 83-a) to hold that a nonmarital child who establishes his or her status under EPTL 4-1.2 (a) (2) (C) should also be recognized as an after-born child under EPTL 5-3.2. Accordingly, it is concluded that Michael Minor is an after-born child pursuant to EPTL 5-3.2 (a) (2) and, as such, entitled to decedent’s entire estate.