*744 OPINION OF THE COURT
Lee L. Holzman, J.
The sole issue tried in this bench trial is whether, pursuant to EPTL 4-1.2 (a) (2) (C), J, born on February 26, 1994, D, born on October 22, 1995, and S, born on August 23, 1998, are entitled to inherit from the decedent as his nonmarital children. The petitioner is the mother of the children and the guardian of theirj property. The respondent, the decedent’s spouse, did not make any mention of these children in her petition for letters of administration. Instead, she listed herself and three other non-marital children of the decedent, who were born prior to her marriage to him, as his only distributees. The petitioner had originally requested that the letters of administration that had issued to the respondent be revoked. However, this request was subsequently withdrawn.
The petitioner and her sister testified similarly. Their testimony was that the decedent was a friend of the sister’s boyfriend. In late 1991, the decedent asked the sister to introduce him to a girl and she invited the petitioner to meet the decedent. They immediately started to date on a regular basis. Since the petitioner lived with her mother at the time, for the first few years the decedent would meet her almost every night at her sister’s apartment. The petitioner was 19 years old when her first child, J, was born. The decedent continued to see the petitioner on a regular basis while she was pregnant with J and at her mother’s apartment after J was born. Photographs of the decedent and J, taken at the petitioner’s mother’s apartment, were admitted into evidence.
After J’s birth, the decedent obtained a furnished room for himself, the petitioner and the baby. The decedent would usually spend four or five nights a week at that residence. After a few months, they moved to an apartment on Eastern Parkway in Brooklyn. The petitioner’s sister lived with them for a good portion of the time that they lived in the Eastern Parkway apartment. D and S were born while they resided there. The petitioner and her sister testified that the decedent would sleep at the Eastern Parkway apartment four or five nights a week, except for the periods during which the decedent and the petitioner were arguing.
The petitioner, the decedent and the three children moved to Crown Street in Brooklyn shortly after S’s birth. The first page of a lease for this apartment, which lists the decedent as the tenant, and a “Lead Paint” disclosure form, signed by the *745 decedent as the lessee, are in evidence. Pictures of the decedent and all three of the petitioner’s children, taken on the same day, are also in evidence. According to the petitioner and her sister, the decedent slept at the Crown Street apartment four times a week until January 2000 when the decedent and the petitioner argued. The decedent did not spend any time at the Crown Street apartment from the time of that argument until April 2000. Thereafter, he resumed sleeping at the apartment two times a week until he sustained what proved to be fatal burns in a boiler explosion at his workplace on June 26, 2000. The decedent died in the hospital on July 18, 2000.
After the decedent’s sister advised the petitioner and her sister about the decedent’s accident, they attempted to visit him in the hospital. The petitioner asserts that she went to the hospital on several occasions and begged the respondent to allow her to see the decedent but her pleas were to no avail. The petitioner and her sister both asserted that on numerous occasions the respondent had telephoned the petitioner’s apartment and cursed at them. They conceded that they had responded in kind.
The petitioner and her sister further testified that the decedent would take the three children for weekend visits to his own mother and sister at their home in Patterson, New Jersey, approximately twice a month. The petitioner testified that she accompanied the decedent and the children on these visits on four occasions. She also stated that the decedent introduced her to his mother and his sister as the “mother of my babies.”
The petitioner and her sister also maintain that the petitioner had no other boyfriends from the time that she met the decedent until his death. Moreover, the petitioner claims that she did not have sexual relations with any other man during this period. The petitioner and her sister both testified that the decedent paid that portion of the rent that was not paid by the petitioner’s public assistance for the apartments in which they resided. They testified that most of these payments, as well as other financial support provided by the decedent for clothes and food, were paid in cash. The sister testified that on numerous occasions, approximately 20 to 25 times, the decedent gave the rent money to her, not to the petitioner, because the petitioner either was not around or because the petitioner and the decedent were arguing at the time. Four money orders signed by the decedent, which appear to be made payable to the order of the owner of the Crown Street apartment, were admitted into evidence.
*746 The decedent was not listed as the father of any of the children on their original birth certificates. However, the petitioner had the decedent’s name added to the birth certificates after his death. The petitioner conceded on cross-examination that she unsuccessfully sought to obtain Social Security benefits for the children as the surviving children of the decedent. However, this application was made solely on the papers. By contrast, both the petitioner and the respondent testified at a hearing to determine whether the children were entitled to workers’ compensation benefits as a result of the decedent’s death. The petitioner prevailed on that application.
The only witness called by the respondent was herself. She testified that she dated the decedent for one year prior to their marriage in 1989. She asserts that she was never separated from him and that he slept at their residence with her every night of their marriage, except for approximately three times a year when he visited his mother for the weekend at her home in Patterson, New Jersey. The respondent accompanied him on only two of these visits because the decedent and his mother were “like best friends” and she did not want to interfere with their visits. She conceded that, while the decedent was alive, she would receive harassing phone calls which consisted of either hang ups or a woman telling her that “her husband had babies out there.” When she asked the decedent about these phone calls, he denied that he had fathered any children other than the three born prior to their marriage. He kept photographs only of those three children. The respondent testified that although she did not know who was making the phone calls while the decedent was alive, at the decedent’s wake she recognized the voice of the petitioner’s sister as the caller.
The respondent’s testimony is consistent with the petitioner’s proof to the extent that she admitted that she denied the petitioner’s requests to visit the decedent at the hospital. She conceded that the decedent’s sister tried to intercede on the petitioner’s behalf, telling her that she should let the petitioner see the decedent. However, the respondent refused the decedent’s sister’s request because when she inquired of the sister whether she knew the petitioner, the decedent’s sister said that she did not. The respondent claimed that the petitioner and her sister were disrespectful to her, both at the hospital and at the decedent’s wake, by telling her that a marriage certificate is nothing more than a piece of paper.
After the decedent’s death, the respondent discovered copies of the decedent’s tax returns in his locker at work. The tax *747 returns for 1996 through 1999 are in evidence. The returns for 1998 and 1999 list the respondent as his spouse and a “niece” with S’s full name as a dependent. The respondent concedes that the decedent does not have any niece by that name.
The court obviously cannot fully accept both the petitioner’s and the respondent’s versions of how many nights a week the respondent spent with each of them. Moreover, the court cannot speculate as to the reason why neither the decedent’s sister nor his mother was called as a witness. Both the petitioner and the respondent had agreed to DNA testing of the decedent’s mother and the petitioner’s children. Unfortunately, the decedent’s mother, who lives in New Jersey, ultimately declined to participate in the testing.
EPTL 4-1.2 (a) (2) (C) provides that nonmarital children are entitled to inherit from their fathers where “paternity has been established by clear and convincing evidence and the father of the child has openly and notoriously acknowledged the child as his own.” Here, the petitioner, in accord with EPTL 4-1.2 (a) (2) (C), has established by clear and convincing evidence that the decedent is the father of the children and that he openly and notoriously acknowledged them as his own children. The photos of the decedent with the children buttress the testimony of the petitioner and her sister that the decedent had a relationship with the petitioner and the children throughout the children’s lives. The documentary evidence clearly established that the decedent was instrumental in renting the Crown Street apartment at which the petitioner and the children resided shortly after S’s birth. The decedent was not wealthy and there does not appear to be any reason why he would rent an apartment for a family with whom he had only a casual relationship. Furthermore, the decedent apparently listed S as a dependent on his federal tax returns for at least a couple of years, albeit he claimed thereon that she was a niece instead of his daughter. The fact that these tax returns were kept at the decedent’s workplace and not at the residence that he shared with his spouse indicates that he did not want the respondent to have the opportunity to peruse them.
In any event, the most compelling evidence was the proof adduced with respect to the decedent’s mother and sister. The court finds credible the petitioner’s proof that the decedent would frequently take the children to visit his mother and sister in New Jersey, that he referred to them to his family as his children and that he introduced the petitioner to them as the *748 “mother of his babies.” The respondent’s testimony that the decedent’s sister tried to persuade the respondent to allow the petitioner to visit the decedent on his death bed gives credence to the petitioner’s proof that the decedent’s sister and mother knew the petitioner as the mother of the decedent’s children. Moreover, regardless of whether the petitioner’s or the respondent’s proof is accepted as to who initiated the calls between the respondent and the petitioner or her sister, or as to the exact content of these calls, both versions reflect that for a prolonged period during the decedent’s life either the petitioner or her sister was asserting that the decedent had children out of wedlock and that the respondent was distressed by the calls. The respondent conceded that she had conversations with the decedent about the calls. Similarly, the respondent’s testimony to the effect that the decedent kept photographs of his children who were not born in this country gives credence to the petitioner’s testimony that she had an argument with the decedent when she found a picture of a young boy who bore a resemblance to their son in his wallet.
The fact that the decedent might have thought that discretion was the better part of valor and, consequently, might have neglected to inform his spouse that he had fathered nonmarital children during their marriage, does not preclude a court from finding that the petitioner established by clear and convincing proof that the decedent openly and notoriously acknowledged paternity of the children (Matter of Anne R. v Estate of Francis C., 234 AD2d 375 [1996]). Here, the decedent’s acknowledgment of the children as his own to both the petitioner’s mother and sister and to his own mother and sister satisfies the statutory requirement that he openly and notoriously acknowledged the children as his own (Matter of Thayer, 1 Misc 3d 791 [2003]; Matter of Wilkins, 180 Misc 2d 568 [1999]).
The court is satisfied that the evidence clearly and convincingly establishes the decedent’s paternity of the three children for the following reasons: the relationship between the decedent and the petitioner spanned approximately a decade; the petitioner’s testimony that she did not have sexual relations with any other man during that period was not rebutted; the decedent’s involvement in obtaining lodging for the petitioner and the children from the birth of the first child until his death; the decedent’s frequent visits with the children to his mother’s house during which he acknowledged to both his sister and his mother that the children were his own; and the fact that one of *749 the children is listed as a dependent on his tax returns (Matter of Sekanic, 271 AD2d 802 [2000]).
For the reasons stated above, the court finds that, pursuant to EPTL 4-1.2 (a) (2) (C), it has been established that the three children are entitled to inherit from the decedent as his non-marital children. A decree may be settled amending the petition for letters of administration to include these children as additional distributees of the decedent.