[851 NYS2d 254]

In the Matter of the Estate of GEORGE POLDRUGOVAZ, Deceased. KIM M. REGO, Respondent; WILLIAM POLDRUGOVAZ, Appellant.

Second Department, February 5, 2008

118

---

**APPEARANCES OF COUNSEL**

*Philip F. Alba, P.C.*, West Islip (*Joseph C. Leshen* of counsel), for appellant.

*John M. Bigler*, Wantagh, for respondent.

**OPINION OF THE COURT**

SKELOS, J.

The issue on this appeal is presented in the context of a motion for pretrial disclosure: In a proceeding brought by a nonmarital child to establish inheritance rights pursuant to EPTL 4-1.2 (a) (2) (C), what standard of proof is to be applied to a pretrial request for posthumous genetic marker testing? Today we hold that a court may grant a pretrial motion for posthumous genetic marker testing when the applicant provides some evidence that the decedent openly and notoriously acknowledged the nonmarital child as his own, and establishes that genetic marker testing is reasonable and practicable under the totality of the circumstances. However, our holding should not be interpreted as altering the statutory standard of proof essential to the standing of a nonmarital child to assert inheritance rights under EPTL 4-1.2 (a) (2) (C), to wit: clear and convincing evidence of paternity together with proof that the alleged father openly and notoriously acknowledged the child as his own (L 1981, ch 75, § 1).

In a petition for letters of administration, Kim M. Rego claims to be the nonmarital child of the decedent, George Poldrugovaz, who died intestate on December 17, 2003. The appellant, William Poldrugovaz, is the decedent's sole surviving sibling. The decedent's parents and one other brother predeceased the decedent. It is undisputed that the decedent was never married and had no other children. The decedent died by electrocution while performing his work at a Macy's store. His body was found

in the ceiling rafters a few days after his death. The Office of the Chief Medical Examiner of the City of New York performed an autopsy to determine the cause of the decedent's death. In the normal course of the autopsy, certain tissue specimens were obtained from the decedent's body.

Following the filing of her petition for letters of administration, the petitioner moved to direct the New York City Chief Medical Examiner to send a portion of the tissue specimens to a laboratory for testing "so as to provide 'clear and convincing' evidence that the Petitioner 'Kim M. Rego' is the decedent's sole distributee and heir-at-law pursuant to EPTL 4-1.2 (a) (2) (C)." In support of her motion, the petitioner submitted, inter alia: the report of the medical examiner; her own affidavit attesting to, among other things, her resemblance to the decedent and a meeting she had with the decedent at which, she contends, the decedent acknowledged in the presence of another person that she was his child; individual photographs of the decedent and the petitioner which, she contends, evince their like familial features; and the affidavits of several other acquaintances of the decedent who attest that the decedent openly acknowledged that he was the petitioner's father. The appellant objected by way of an answer to the petition and a memorandum of law in opposition.

Relying on the decision of the Appellate Division, Fourth Department, in *Matter of Morningstar* (17 AD3d 1060, 1060-1061 [2005]), the Surrogate's Court found that the petitioner provided "some evidence" that the decedent openly and notoriously acknowledged paternity and granted the petitioner's motion in its entirety.

The appellant, relying on *Matter of Davis* (27 AD3d 124, 128-129 [2006]), a subsequent opinion and order of this Court, contends that the petitioner's motion should have been denied absent clear and convincing proof that the decedent openly and notoriously acknowledged that the petitioner was his child.

In *Matter of Morningstar* our colleagues in the Appellate Division, Fourth Department, found "no basis in the language of the statute or the circumstances of [the] proceeding" in Surrogate's Court to require the nonmarital children "to demonstrate first that decedent openly and notoriously acknowledged them as his children" before granting their application made pursuant to CPLR 3124 to obtain posthumous DNA testing on available blood or tissue samples (17 AD3d at 1060; *see also Matter of Bonanno*, 192 Misc 2d 86, 88 [2002]). Our holding in

*Matter of Davis* (27 AD3d 124 [2006]) is to the contrary. It requires a party seeking posthumous genetic marker testing to first establish by clear and convincing evidence that the decedent openly and notoriously acknowledged paternity (*see Matter of Davis*, 27 AD3d 124, 128-129 [2006]).

These divergent opinions demonstrate the prescience of the bar when it commented on the proposed legislation to add EPTL 4-1.2 (a) (2) (C) (*see* 1981 NY Senate-Assembly Bill S1709-A, A2148-A) when the proposed legislation was circulated prior to its enactment: "The bill leaves unanswered exactly how the standards of 'clear and convincing evidence' and 'openly and notoriously acknowledged' will be applied . . . the risk of inconsistent decisions is inherent in the application of such standards" (Mem to Governor, Comm on Legislation, Trusts and Estates Section, NY St Bar Assn, Apr. 22, 1981, at 2, Bill Jacket, L 1981, ch 75).

The Court of Appeals has not addressed this issue. Accordingly, the appellant contends that the doctrine of stare decisis compels us, upon the authority of *Matter of Davis*, to reverse. Stare decisis, the principle that " '[p]recedents and rules must be followed' " is not without limitation (*Matter of Eckart*, 39 NY2d 493, 498 [1976], quoting Blackstone, Commentaries on the Law of England, at 70). Courts are bound to adhere to their prior holdings unless " 'it can be shown that the law has been misapplied, or where the former determination is evidently contrary to reason' " (*Matter of Eckart*, 39 NY2d at 499, quoting *Rumsey v New York & New England R.R. Co.*, 133 NY 79, 85 [1892]). To be sure, courts may more readily reexamine a court-made rule as opposed to one involving error in the construction of a statute (*cf. Matter of Eckart*, 39 NY2d at 499).

Neither EPTL 4-1.2 (a) (2) (C) nor the Surrogate's Court Procedure Act addresses the issue of pretrial discovery. Our holding in *Matter of Davis* is less than two years old and is not ingrained in the jurisprudence of the State. To the extent our Court addressed this statute prior to *Matter of Davis*, the Court did not address the question of pretrial disclosure presented here and in *Matter of Davis* (*see Matter of Anglin*, 216 AD2d 557 [1995]; *Matter of Rifkin*, 177 AD2d 631 [1991]). Rather, in those cases the Court reviewed determinations of the respective Surrogate's Courts as to whether each petitioner had met the burden of proving that he or she was the nonmarital child of the decedent (*id.*). Accordingly, those cases do not establish precedent as to the issue now before the Court (*see Robinson Motor Xpress, Inc. v HSBC Bank, USA*, 37 AD3d 117, 123-124 [2006]).

A review of several decisions in the Surrogate's Courts and the opinions of legal commentators discussed infra reveals that *Matter of Davis* is contrary to the established legal trend here and in other states, which is to enhance the ability of nonmarital children to assert their rights of inheritance (*see generally* Cooper, *Posthumous Paternity Testing: A Proposal to Amend EPTL 4-1.2 [a] [2] [D]*, 69 Alb L Rev 947 [2006]; Schuler, *The Liberalization of Posthumous Paternity Testing—Expanding the Rights of Illegitimate Children*, 17 Quinnipiac Prob LJ 150, 150-151 [2003]). *Matter of Davis* did not create, or interpret legislation creating, a new substantive right. Rather, it imposed a court-made exacting standard of proof previously not applied to pretrial disclosure. In doing so, *Matter of Davis* created an anomaly by imposing the standard of proof applicable to the ultimate issue in controversy on the party seeking to obtain pretrial disclosure of the most reliable evidence essential to meeting its burden of proof on the ultimate issue. Indeed, the consequence of such a rule of pretrial procedure may, under certain circumstances, effectively deprive the party seeking disclosure from establishing his or her entitlement to the remedy created by the statute. Under these particular circumstances, the application of the doctrine of stare decisis is less compelling. Accordingly, we take this opportunity to reexamine our holding in *Matter of Davis* (*cf. People v Taylor*, 9 NY3d 129 [2007]; *Matter of Eckart*, 39 NY2d 493, 499, 502 [1976]).

As with all requests for court-ordered discovery (*see e.g. Kavanagh v Ogden Allied Maintenance Corp.*, 92 NY2d 952, 954 [1998]), when considering the reasonableness of an application for court-ordered genetic marker testing in a proceeding to establish inheritance rights pursuant to EPTL 4-1.2 (a) (2) (C), we recognize that special consideration must be given to the sensitive and sometimes competing interests inherent in these proceedings. Accordingly, we adhere to our holding in *Matter of Davis* only to the extent it requires a party seeking court-ordered posthumous genetic marker testing to provide some evidence that the decedent openly and notoriously acknowledged paternity prior to obtaining an order authorizing such testing (*see Matter of Davis*, 27 AD3d at 128-129; *see also* Turano, 2006 Supp Practice Commentaries, McKinney's Cons Laws of NY, Book 17B, EPTL 4-1.2, 2007 Cum Pocket Part, at 128). However, to the extent our holding in *Matter of Davis* requires a party seeking posthumous genetic marker testing to prove such an acknowledgment by clear and convincing evidence, it should no

longer be followed because it sets the evidentiary threshold too high.

EPTL 4-1.2 (a) governs, inter alia, the circumstances under which a nonmarital child will have established his or her standing to assert inheritance rights from or through his or her father and paternal kindred. As it relates to the issue on appeal, EPTL 4-1.2 (a) reads as follows:

"(a) For the purposes of this article . . .

"(2) A non-marital child is the legitimate child of his father so that he and his issue inherit from his father and his paternal kindred if . . .

"(C) paternity has been established by clear and convincing evidence and the father of the child has openly and notoriously acknowledged the child as his own; or

"(D) a blood genetic marker test had been administered to the father which together with other evidence establishes paternity by clear and convincing evidence."

The case law developed with respect to a subsequently-enacted companion clause of the statute (EPTL 4-1.2 [a] [2] [D], as added by L 1987, ch 434, § 2) is instructive on the issue at bar. Subdivision (a) (2) (D) of EPTL 4-1.2 specifically authorizes the use of genetic marker testing to satisfy the "clear and convincing evidence" standard of proof necessary to establish paternity, so long as there is other evidence of paternity. EPTL 4-1.2 (a) (2) (D), however, does not specify what the other evidence may, or must, be. Although the statute did not expressly provide that genetic marker testing be performed during the decedent's life, that limitation was imposed by judicial interpretation (*see Matter of Sekanic*, 229 AD2d 76, 78 [3d Dept 1997] [court denied application for exhumation of body to perform posthumous DNA testing]; *Matter of Janis*, 210 AD2d 101, 101-102 [1st Dept 1994] [same]; *Matter of DeLuca*, NYLJ, Jan. 15, 1998, at 37, col 2 [Sur Ct, Suffolk County] [notwithstanding the fact that DNA evidence obtained within hours of death established paternity with a 99.19% probability, the Surrogate was constrained under the authority of *Matter of Sekanic* and *Matter of Janis*, to reject the proffer of the DNA evidence]; *Matter of Johnson*, NYLJ, Oct. 15, 1997, at 37, col 2 [Sur Ct, Westchester County] [same where DNA established paternity with 99.93% probability]).

The requirement that the genetic marker testing authorized by EPTL 4-1.2 (a) (2) (D) be performed predeath was, in part, founded on the judiciary's literal adherence to the Legislature's use of the past tense "had" (see EPTL 4-1.2 [a] [2] [D] ["a blood genetic marker test had been administered to the father"]; Matter of Sekanic, 229 AD2d at 78; Matter of Janis, 210 AD2d at 101-102). In addition, both the Appellate Division, First Department, and the Appellate Division, Third Department, found that under the circumstances presented, postmortem genetic marker testing was not warranted where to do so would unreasonably require disinterment of the decedent's body (see Matter of Sekanic, 229 AD2d at 78, citing Matter of Currier [Woodlawn Cemetery], 300 NY 162, 164 [1949]; Matter of Janis, 210 AD2d at 101-102, citing Saperstein v Commercial Travelers Mut. Acc. Assn., 36 NY2d 79, 84 [1975]), a consideration not present in this proceeding.

The likelihood that a genetic marker test will have been conducted prior to the alleged father's death so as to meet the reach of EPTL 4-1.2 (a) (2) (D) appears to be limited to those instances where he voluntarily submitted to the test or where he was ordered to submit to such a test in a proceeding brought in Family Court to establish paternity (see Family Ct Act §§ 522, 523, 532). However, under those circumstances, resort to EPTL 4-1.2 (a) (2) (D) will be obviated since such a Family Court paternity proceeding does not abate on death (see Family Ct Act § 519 [c]).

The restrictive reading of EPTL 4-1.2 (a) (2) (D) has been the subject of criticism and it has been suggested that the statute be amended to allow for posthumous DNA testing (see Matter of Santos, 196 Misc 2d 972, 975 [2003]; Matter of Bonanno, 192 Misc 2d 86 [2002]; Matter of Anne R. v Estate of Francis C., 167 Misc 2d 343, 350 [1995], affd 234 AD2d 375 [1996]; Cooper, Posthumous Paternity Testing: A Proposal to Amend EPTL 4-1.2 [a] [2] [D], 69 Alb L Rev 947 [2006]; Schuler, The Liberalization of Posthumous Paternity Testing—Expanding the Rights of Illegitimate Children, 17 Quinnipiac Prob LJ 150, 150-151; see also DeFrancisco, Sponsor's Mem in Support of NY Senate Bill S6990, Apr. 19, 2004; Dinowitz, Sponsor's Mem in Support of NY Assembly Bill A2850-A, Feb. 3, 2003). Indeed, the limitation imposed on the application of EPTL 4-1.2 (a) (2) (D), like the limitation imposed on the application of EPTL 4-1.2 (a) (2) (C) by Matter of Davis, was contrary to the steadily consistent trend to enhance the ability of nonmarital children to assert rights of

inheritance such that they should be treated in pari materia with marital children (*see Matter of Best*, 66 NY2d 151, 154 [1985], *cert denied* 475 US 1083 [1986]; *Matter of Uhl*, 33 AD3d 181, 182-183 [2006]; *Matter of Hoffman*, 53 AD2d 55, 57-67 [1976]; *Matter of Bonanno*, 192 Misc 2d 86 [2002]; *Matter of Wilkins*, 180 Misc 2d 568 [1999]; *see also Weber v Aetna Casualty & Surety Co.*, 406 US 164, 165 [1972]; *see generally* 69 Alb L Rev at 957-958).

Consistently increasing legislative sensitivity to the inheritance rights of nonmarital children is reflected not only in the evolution of legislation creating procedural avenues for nonmarital children to assert rights of inheritance by and from their fathers and paternal kindred (*see* former Decedent Estate Law § 83-a; EPTL 4-1.2, 5-4.5), but also in the evolution of the nomenclature found in such legislation which was designed to ameliorate the harshness of the archaic terms "filius nullius" (child of nobody) and "bastard" and the legal doctrines associated with such offensive nomenclature (*see generally* 4th Rep of Temp St Commn on Modernization, Rev and Simplification of Law of Estates, Rep No. 1.8A, 1965 NY Legis Doc No. 19, at 265-268). Accordingly, such terms as "illegitimate children" and "child born out of wedlock" have since been replaced by the less offensive term "non-marital child" (*see* L 1966, ch 952 ["Inheritance by or from illegitimate persons"]; L 1981, ch 67, § 2 [deleted "illegitimate" and added "child born out of wedlock"]; L 1992, ch 595, § 9 [deleted "child born out of wedlock" and added "non-marital child"]).

Coincident with the evolution of these statutes was, and continues to be, the evolution of social mores as reflected in population demographics. The percentage of children born to unmarried mothers increased from 5.2% in 1959 to 36.8% in 2005 (Vital Statistics of the United States, 2000, vol 1, Natality, table 1-17; Sutton and Mathews, *Trends in Characteristics of Births by State: United States, 1990, 1995, and 2000-2002*, 52 National Vital Statistics Reports [No. 19] table 7; Hamilton, Martin and Sutton, *Births: Preliminary Data for 2003*, 53 National Vital Statistics Reports [No. 9] table A; Hamilton, Martin and Ventura, *Births: Preliminary Data for 2005*, National Center for Health Statistics). No doubt, many fathers of nonmarital children openly acknowledge and support their children. Nevertheless, it cannot be gainsaid that there are many men who father nonmarital children and fail, refuse, or prefer not to acknowledge them as their own (*see e.g. King v*

*Tanner*, 142 Misc 2d 1004 [1989]). In 2006, over 39,000 original paternity petitions were filed in the State of New York (*see Twenty-Ninth Annual Report of the Chief Administrator of the Courts for Calendar Year 2006*, http://www.nycourts.gov/reports/annual/pdfs/2006annualreport.pdf, at 13 [accessed Feb. 5, 2008]). Also, there are many mothers who, for a variety of reasons, prefer not to reveal the paternity of their children (*see Mills v Habluetzel*, 456 US 91, 105 n 4 [1982, O'Connor, J., concurring]; *Matter of Gaynor*, 13 Misc 3d 331, 332 [2006]). These nonmarital children are no less entitled to inherit from their fathers and paternal kindred than those who have been embraced by their fathers' acknowledgment, particularly where reliable proof is available to accurately establish paternity (*see Matter of Lalli*, 43 NY2d 65, 71-72 [1977, Cooke, J., dissenting], *affd* 439 US 259 [1978]). While the legislation was not meant to be a commentary on changing social mores (*see id.* at 70), the practical reality that a significant segment of the population is directly affected by paternity and inheritance rights issues cannot be ignored (*see Matter of Hoffman*, 53 AD2d 55, 56-57 [1976]).

Following *Sekanic* and *Janis,* several decisions in the Surrogate's Courts recognized that a negative consequence of the literal reading of EPTL 4-1.2 (a) (2) (D) was that it effectively precluded the use of highly probative genetic marker testing as a means of proving paternity, thereby impairing the ability of nonmarital children to assert rights of inheritance. Relying on the absence of any such limiting language in EPTL 4-1.2 (a) (2) (C), and apparently not compelled to wait for remedial legislation, several Surrogates permitted posthumous genetic marker testing as a means of establishing clear and convincing proof of paternity (*see Matter of Kenneth V.*, 7 Misc 3d 250 [2004] [posthumously obtained DNA test results from the decedent's toothbrush were used to establish that decedent was petitioner's biological father]; *Matter of Thayer*, 1 Misc 3d 791, 792 [2003] [DNA test results on blood and tissue samples taken from decedent after a fatal automobile accident established clear and convincing evidence of paternity]; *Matter of Santos*, 196 Misc 2d at 975 [court accepted postdeath DNA test results performed on blood samples obtained in hospital following fatal auto accident to prove or disprove paternity and urged the Legislature to amend subdivision (a) (2) (C) and (D) to include postdeath DNA testing]; *Matter of Bonanno*, 192 Misc 2d 86 [2002] [DNA tests performed on blood gathered posthumously by the medical

examiner used to disprove paternity]; *Matter of Johnson*, NYLJ, Oct. 15, 1997, at 37, col 2 [Sur Ct, Westchester County] [after rejecting the application of DNA evidence to support a petition to establish inheritance rights pursuant to EPTL 4-1.2 (a) (2) (D), the Surrogate noted that posthumous DNA testing may establish paternity pursuant to EPTL 4-1.2 (a) (2) (C)]; *Matter of Johnson*, NYLJ, Sept. 17, 1998, at 26, col 5 [Sur Ct, Westchester County] [upon the submission of sufficient proof establishing open and notorious acknowledgment of paternity "coupled with the DNA evidence" obtained postmortem, the court made a finding of paternity pursuant to EPTL 4-1.2 (a) (2) (C)]; *see also Matter of Gaynor*, 13 Misc 3d 331 [2006] [Surrogate's Court compelled party to submit to DNA testing where maternity was at issue]; *Matter of Nasert*, 192 Misc 2d 682 [2002] [court admitted into evidence DNA test results of decedent's identical twin to establish that the decedent was the biological father of a nonmarital daughter]; *Matter of Sandler*, 160 Misc 2d 955 [1994] [court granted request for DNA testing made by the parents of the putative father who sought to disprove paternity]; *Matter of Anne R. v Estate of Francis C.*, 167 Misc 2d 343 [1995] [Family Court permitted posthumous analysis of frozen blood sample in a proceeding to establish paternity pursuant to Family Ct Act § 519 (d)]). However, none of those cases squarely addressed the issue which resulted in the divergent opinions in *Matter of Davis* and *Matter of Morningstar*. What standard of proof is to be applied to a pretrial request for posthumous genetic marker testing?

As Justice Goldstein aptly noted in *Matter of Davis,* "indiscriminate posthumous DNA testing" will not serve the State's policy interests attendant to these types of proceedings (27 AD3d at 129). Since the enactment of the first legislation establishing a procedural mechanism for nonmarital children to assert paternal inheritance rights (former Decedent Estate Law § 83-a, as added by L 1965, ch 958, § 1) through its successor statute and the amendments thereto (EPTL 4-1.2, as added by L 1966, ch 952, as amended by L 1979, ch 139, § 1; L 1981, ch 75, §§ 1, 2; L 1987, ch 434, § 2; L 1994, ch 170, § 351) to the present, the principal legislative and judicial concern has been to strike a balance between the right of nonmarital children to be treated in pari materia with marital children and the desire to protect the estates of decedents from fraudulent claims, all while accomplishing the fair and efficient administration of justice (*see Matter of Davis*, 27 AD3d at 129; *Matter of Sekanic*,

229 AD2d at 78, citing Mem of Senator Mary Goodhue, 1987 NY Legis Ann, at 156; *Matter of Santos*, 196 Misc 2d at 975; *see also Lalli v Lalli*, 439 US 259 [1978]; *Matter of Constance G. v Herbert Lewis L.*, 119 AD2d 209, 211 [1986]). Particularly peculiar to these proceedings is the potential, not present here or in *Matter of Davis,* that genetic testing may require the exhumation of the decedent's body (*see Matter of Sekanic*, 229 AD2d at 78; *Matter of Janis*, 210 AD2d at 101-102; *Matter of Bonanno*, 192 Misc 2d 86, 88 [2002]). Exhumation necessarily involves considerations such as the sanctity of the grave site, and the privacy and religious convictions of the decedent and his next-of-kin (*see Saperstein v Commercial Travelers Mut. Acc. Assn.*, 36 NY2d 79, 84 [1975]; *Matter of Currier [Woodlawn Cemetery]*, 300 NY 162, 164 [1949]). In those cases, the courts must appropriately weigh the need for discovery against the privacy and religious concerns of the decedent, and the desires and motivations of next-of-kin who oppose the request for postmortem discovery (*see O'Neill v Oakgrove Constr.*, 71 NY2d 521, 529 [1988]; *Cynthia B. v New Rochelle Hosp. Med. Ctr.*, 60 NY2d 452, 461 [1983]).

The Legislature, by imposing the standard of clear and convincing evidence, has appropriately chosen an exacting standard of proof on the ultimate issue of paternity under EPTL 4-1.2 (a) (2) (C) since important personal interests are at stake (*see e.g. Santosky v Kramer*, 455 US 745 [1982]; *Addington v Texas*, 441 US 418, 424 [1979]; *Matter of Storar*, 52 NY2d 363, 379 [1981], *cert denied* 454 US 858 [1981]). Clear and convincing evidence is defined as follows: "a party who must establish (his, her) case by clear and convincing evidence must satisfy [the trier of fact] that the evidence makes it highly probable that what (he, she) claims is what actually happened" (PJI 1:64; *see Colorado v New Mexico*, 467 US 310, 316 [1984]). Subdivision (a) (2) (C) of EPTL 4-1.2 requires a nonmarital child seeking to establish standing to assert rights of inheritance to prove paternity by clear and convincing evidence and establish that the father openly and notoriously acknowledged paternity, and nothing more. Indeed, a literal reading of the statute reveals that the "clear and convincing" standard modifies only the phrase "proof of paternity" and the phrase "the father of the child has openly and notoriously acknowledged the child as his own" is not modified by any standard of proof. Consideration of the juxtaposition of the words in the sentence structure together with the statute's silence as to pretrial

disclosure practice leads us to conclude that the Legislature did not intend to impose "clear and convincing evidence" as a threshold burden of proof for the purposes of pretrial discovery.

In the absence of a legislatively-imposed standard, the courts may adopt an appropriate remedy (*cf.* McKinney's Cons Laws of NY, Book 1, Statutes § 363, at 527). However, in so doing, the courts should not "significantly affect the legal relationship between [the] litigating parties" or "enlarge or abridge rights conferred by statute" (*People v Ramos*, 85 NY2d 678, 687, 688 [1995]). We find that the imposition of the clear and convincing evidentiary standard of proof, when applied to a request for pretrial disclosure, significantly alters the rights conferred on the parties by EPTL 4-1.2 (a) (2) (C). Rather than facilitate the process of determining a nonmarital child's claim of rights to inheritance, such an exacting standard makes it highly improbable that a nonmarital child will be able to traverse the threshold and obtain disclosure of what has come to be regarded by the Legislature as presumptive scientific evidence (*see* Family Ct Act § 532 [a]; CPLR 4518 [d]; *see also* CPL 440.30 [1-a]).

In the absence of a specific pretrial practice provision in the Surrogate's Court Procedure Act, article 31 of the CPLR governs discovery in Surrogate's Court proceedings (*see* SCPA 102; *Matter of Gaynor*, 13 Misc 3d 331, 333-334 [2006]). CPLR 3101 (a) mandates "full disclosure of all matter material and necessary in the prosecution or defense of an action" and is to be liberally construed to accomplish that purpose (*see Allen v Crowell-Collier Publ. Co.*, 21 NY2d 403, 406 [1968]). "The test is one of usefulness and reason" (*id.*).

The usefulness of the genetic marker evidence sought to be obtained is not in doubt. Genetic marker or DNA test results have been widely recognized by the courts as reliable scientific proof for many years (*see generally People v Wesley*, 83 NY2d 417, 426 [1994]; *Matter of Constance G. v Herbert Lewis L.*, 119 AD2d 209, 211 [1986]). More particularly, genetic evidence is recognized by the Legislature as virtually unparalleled proof in establishing paternity (*see* EPTL 4-1.2 [a] [2] [D]; Family Ct Act § 532 [a]; *see also* CPLR 4518 [d]). In addition, genetic marker testing has been used to establish maternity, sibling and other family relationships (*see generally Matter of Gaynor*, 13 Misc 3d 331, 333-334 [2006]) and the identity of soldiers and victims of mass tragedies. In the context of a criminal case, a defendant may be ordered to permit the taking of tissue samples which may be submitted for genetic analysis (*see* CPL 240.40 [2] [b]

[v]) and a convicted defendant may utilize genetic marker evidence to obtain a retrial (*see* CPL 440.30 [1-a]).

With the usefulness of genetic marker testing well established, we recognize that guiding the Legislature in balancing the countervailing factors inherent in these proceedings has been the concept of reasonable practicability and evolving statutory safeguards (*see Matter of Lalli*, 43 NY2d 65, 69-70 [1977], *affd* 439 US 259 [1978]; 4th Rep of Temp St Commn on Modernization, Rev and Simplification of Law of Estates, Rep No. 1.8A, 1965 NY Legis Doc No. 19, at 265-268; Recommendation of Law Rev Commn, 1981 NY Legis Doc No. 65[B], at 1-10; *Matter of Bonanno*, 192 Misc 2d 86, 88 [2002]; *Matter of Gaynor*, 13 Misc 3d 331, 334 [2006]; *see also LaVallee v State of N.Y. Off. of Children & Family Servs.*, 182 Misc 2d 58, 59-60 [1999]; *McGrath v Nassau Health Care Corp.*, 209 FRD 55, 59-61 [2002]). Accordingly, we hold that when considering, sui generis, an application for an order directing posthumous genetic marker testing, the court may properly grant the relief when the applicant provides some evidence that the decedent openly and notoriously acknowledged the nonmarital child as his own, and establishes that genetic marker testing is practicable and reasonable under the totality of the circumstances. Among the factors to be considered by the court on an ad hoc basis are the following: (1) whether evidence presented demonstrates a reasonable possibility that the genetic testing will establish a match; (2) the practicability of obtaining the tissue sample for the purpose of conducting the genetic testing, including whether the sample is readily available; (3) whether there is a need to exhume the decedent's body or obtain the sample from a nonparty; (4) whether appropriate safeguards were, or will be, taken to insure the reliability of the genetic material to be tested; and (5) the privacy and religious concerns of the decedent and or his family members.

This standard strikes the appropriate balance between and among the state interest in timely, just, and orderly estate administration, respect for the privacy interests of the decedent and his family, and the right of a nonmarital child to material and relevant evidence available to establish paternity by clear and convincing proof. With respect to the special concerns attendant to those cases where exhumation is required to accomplish genetic marker testing, our application of the reasonable practicability standard should not be read to supplant the standard long applied to cases where exhumation is requested, subject to any applicable statutory constraints (*see* N-PCL 1510).

"Good and substantial reasons must be shown before disinterment is to be sanctioned" (*Matter of Currier [Woodlawn Cemetery]*, 300 NY 162, 164 [1949]; *see Saperstein v Commercial Travelers Mut. Acc. Assn.*, 36 NY2d 79, 84 [1975]; *Matter of Sekanic*, 229 AD2d at 78; *Matter of Janis*, 210 AD2d at 101).

Moreover, in light of the advances in DNA testing, we note, the likelihood of the need for exhumation is de minimis (*see Matter of Kenneth V.*, 7 Misc 3d 250 [2004] [specimen obtained from toothbrush]; *Matter of Nasert*, 192 Misc 2d 682 [2002] [DNA specimen taken from living twin]; *Matter of Sandler*, 160 Misc 2d 955 [1994] [DNA specimen taken from grandparents]).

The assumption that opportunistic individuals will file fraudulent claims and unduly hinder the efficient administration of decedents' estates has been a concern (*see Matter of Davis*, 27 AD3d 124, 128 [2006]). However, like the presumption of legitimacy (*see Matter of Constance G. v Herbert Lewis L.*, 119 AD2d 209, 211 [1986]), this assumption arose prior to the advent of modern scientific proof and as such should not be permitted to suppress the search for the truth (*id.; see also State Div. of Human Rights v County of Monroe*, 48 NY2d 727, 730 [1979, Wachtler, J., dissenting]). That is not to suggest that every claim made pursuant to EPTL 4-1.2 (a) (2) (C) will be meritorious. Nevertheless, in light of the advances in genetic testing, the imposition of too high a threshold, i.e., the clear and convincing evidentiary standard, to obtain access to the technology that produces the most objectively reliable evidence would be counterproductive to the avoidance of fraudulent claims. Logic dictates that a fraudulent opportunistic interloper will be dissuaded from filing a false claim by the knowledge that known family members may rely on objectively reliable scientific proof to conclusively defeat his or her claim (*see Matter of Bonanno*, 192 Misc 2d 86, 87-88 [2002]; *Matter of Sandler*, 160 Misc 2d 955, 956-957 [1994]; *see also King v Tanner*, 142 Misc 2d 1004, 1012-1013).

Here, in the exercise of our power of factual review, we find that the affidavits submitted in support of the petition provided some evidence that the decedent openly and notoriously acknowledged to his family and friends in his community that the movant was his child (*see Matter of Tumminia v Savattere*, 236 AD2d 616 [1997] [disclosure to friends and relatives]; *Matter of Anne R. v Estate of Francis C.*, 234 AD2d 375, 376 [1996] [acknowledgment of paternity in the community in which the child lives]; *Matter of Wilkins*, 180 Misc 2d 568 [1999] [disclosure

to family]; *cf. Matter of Gentile*, 2002 NY Slip Op 40026[U] [Sur Ct, Nassau County 2002] [statement made in confidence to spouse and one friend did not constitute open and notorious acknowledgment]). In addition, we find that the evidence presented on the petitioner's motion established that her request for posthumous DNA testing of the decedent's tissue samples taken by the medical examiner was reasonable and practicable under the totality of the circumstances. The evidence that the decedent acknowledged paternity, together with the petitioner's resemblance to the decedent, as evident in the photographs submitted by the petitioner, demonstrated a reasonable possibility of a match. Of particular significance here is that the tissue specimens are readily available for testing and will not require the exhumation of the decedent's body or the taking of a specimen from a nonparty. Indeed, the samples were secured in the regular course of business of the Chief Medical Examiner shortly after the decedent's body was discovered and prior to the commencement, perhaps even prior to the contemplation, of litigation. Under these circumstances, the Surrogate's Court did not err in granting, in its entirety, the petitioner's motion for pre-trial DNA testing.

Accordingly, the order is affirmed.

SPOLZINO, J.P., FISHER and DICKERSON, JJ., concur.

Ordered that the order is affirmed, without costs or disbursements.