[927 NE2d 1042, 901 NYS2d 558]

SIDNEY HIRSCHFELD, Director, Mental Hygiene Legal Service, Second Judicial Department, Appellant, v MITCHELL TELLER, as Administrator of Woodmere Rehabilitation and Health Care Center, Inc., et al., Respondents.

Argued February 9, 2010; decided March 30, 2010

## POINTS OF COUNSEL

*Mental Hygiene Legal Service, Second Judicial Department*, Mineola (*Lisa Volpe, Sidney Hirschfeld* and *Dennis B. Feld* of counsel), for appellant. I. Mental Hygiene Legal Service's statutory mandate to provide legal representation and advocacy for individuals with mental illness extends to such individuals residing in places or facilities that may not possess operating certificates issued by the State Office of Mental Health, but nevertheless fall under the Mental Hygiene Law licensing statute and its corresponding regulations. (*Cohen v Lord, Day & Lord,* 75 NY2d 95; *Leader v Maroney, Ponzini & Spencer,* 97 NY2d 95; *Brad H. v City of New York,* 185 Misc 2d 420, 276 AD2d 440.) II. The lower courts incorrectly defined Mental Hygiene Legal Service's mandate within the context of the State Office of Mental Heath's decision-making function. (*Besunder v Coughlin,* 102 Misc 2d 41; *Brown v Lavine,* 78 Misc 2d 1085; *Matter of Mental Hygiene Legal Serv. v Maul,* 36 AD3d 1133; *Matter of Myerson v Schechter,* 25 Misc 2d 291; *Matter of Board of Educ. of Glen Cove City School Dist. v O'Shea,* 304 AD2d 662; *Matter of Overhill Bldg. Co. v Delany,* 28 NY2d 449; *Flaherty v McCall,* 262 AD2d 890; *Gilberg v Barbieri,* 53 NY2d 285; *Comi v Breslin & Breslin,* 257 AD2d 754; *Flacke v Onondaga Landfill Sys.,* 69 NY2d 355; *Brad H. v City of New York,* 185 Misc 2d 420, 276 AD2d 440.) III. Respondent nursing homes fall within the licensing statute of Mental Hygiene Law article 31 and its corresponding regulations, based on the characteristics of the

facilities themselves, the residents with primary diagnoses of mental illness whom they serve, and the services they provide to those residents. IV. Public policy considerations support the conclusion that Mental Hygiene Legal Service must be permitted to provide the same independent oversight and advocacy to individuals with primary diagnoses of mental illness currently residing in respondent nursing homes as the agency provides to others with mental illness residing in Office of Mental Health-operated or licensed facilities. (*Matter of Julio R.*, 16 AD3d 423; *Matter of Francine T.*, 302 AD2d 533; *Matter of Seltzer v Hogue*, 187 AD2d 230.)

*Abrams, Fensterman, Fensterman, Eisman, Greenberg, Formato & Einiger, LLP,* Lake Success (*Sarah C. Lichtenstein* of counsel), for respondents. I. Mental Hygiene Legal Service jurisdiction is limited by statute to places required to have an Office of Mental Health operating certificate. (*Joseph S. v Hogan*, 561 F Supp 2d 280.) II. The responsible state agencies have determined that the nursing homes are not required to obtain Office of Mental Health operating certificates, and those decisions are dispositive. (*Matter of Natural Resources Defense Council v New York City Dept. of Sanitation*, 83 NY2d 215; *Matter of Albert F. v Stone*, 169 Misc 2d 838; *Brad H. v City of New York*, 185 Misc 2d 420, 276 AD2d 440; *Flacke v Onondaga Landfill Sys.*, 69 NY2d 355; *Flaherty v McCall*, 262 AD2d 890; *Matter of Ferrelli v Long Is. Coll. Hosp. School of Nursing*, 204 AD2d 544; *Keith v New York State Teachers' Retirement Sys.*, 46 AD2d 938; *Lade v Levitt*, 33 AD2d 956; *Staatsburg Water Co. v Staatsburg Fire Dist.*, 72 NY2d 147; *United States v Western Pacific R. Co.*, 352 US 59.) III. The larger statutory scheme confirms that the nursing homes are not required to obtain Office of Mental Health operating certificates. (*Pajak v Pajak*, 56 NY2d 394; *Matter of Town of Riverhead v New York State Bd. of Real Prop. Servs.*, 5 NY3d 36; *Matter of Union Indem. Ins. Co. of N.Y.*, 89 NY2d 94; *Festinger v Edrich*, 32 AD3d 412; *Matter of Subpoena Duces Tecum to Jane Doe*, 293 AD2d 231, 99 NY2d 434.) IV. The federally mandated regulatory process for discharging persons from psychiatric facilities to nursing homes confirms that residents in the nursing homes are not being treated for mental disability. V. Policy considerations concerning the rights of nursing home residents confirm that Mental Hygiene Legal Service should not be given unfettered access to certain residents and their medical records.

Pigott, J.

Beginning as early as 1996, defendants, certain nursing homes in New York State, began accepting as residents patients discharged from facilities licensed by the Office of Mental Health (OMH). The patients were primarily from New York State psychiatric hospitals with diagnoses of mental illness. All but one of defendant nursing homes placed the patients in discrete units of the residence, referred to as "neurobiological units" (NBUs), where the residents received psychiatric and psychosocial rehabilitative services. Defendant nursing homes operate under licensing by the Department of Health but have never sought, nor obtained, licenses from OMH.

In October 2002, a series of related articles began appearing in the New York Times focusing on the NBUs and claiming that NBU residents were being deprived of legal protections afforded to patients committed to psychiatric wards, including the right to a lawyer. Upon learning of the articles, Mental Hygiene Legal Service (MHLS) conducted an investigation and thereafter sought access to NBU residents and their records in order to provide advocacy and legal representation to those who might be in need of such services. Defendant nursing homes denied MHLS such access.

Thereafter, in June 2003, plaintiff Sidney Hirschfeld, Director of MHLS (hereinafter MHLS), commenced this action against defendant nursing homes alleging that because the nursing homes are providing services for mentally disabled residents, MHLS has a right of access to such residents. MHLS sought judgment declaring that it has the right of access at any and all times to the residents and their records and also sought an injunction enjoining defendant nursing homes from denying MHLS such access.

Defendant nursing homes answered arguing, among other things, that because MHLS has jurisdiction only over facilities required to obtain operating certificates and OMH has determined that the nursing homes are not required to have one, MHLS was without authority to access the residents.

At some point during the litigation, defendant nursing homes shut down the NBUs.* Thus, defendant nursing homes no longer maintain discrete units in which the NBU patients reside.

---

* Defendant nursing homes maintain that the last date any resident was accepted into an NBU was April 30, 2004, and the date the last resident was

After motion practice not relevant here and significant discovery, both parties moved for summary judgment. Supreme Court granted defendant nursing homes' motion and dismissed the complaint (2006 NY Slip Op 30608[U]). The Appellate Division modified Supreme Court's order by remitting the matter to Supreme Court for, among other things, entry of a judgment declaring that MHLS does not have the right of access to the mentally ill residents of NBUs of defendant nursing homes (*Hirschfeld v Teller*, 50 AD3d 855 [2008]).

This Court granted MHLS leave to appeal (12 NY3d 707 [2009]). We now affirm.

MHLS is statutorily mandated to provide legal services and assistance to individuals with mental disabilities. Such mandate is delineated in Mental Hygiene Law § 47.01 (a), which provides, in relevant part:

> "There shall be a mental hygiene legal service of the state in each judicial department. The service shall provide legal assistance to patients or residents of a facility as defined in section 1.03 of this chapter, or any other place or facility which is required to have an operating certificate pursuant to article sixteen or thirty-one of this chapter, and to persons alleged to be in need of care and treatment in such facilities or places, and to persons entitled to such legal assistance as provided by article ten of this chapter."

Thus, by statute, MHLS's jurisdiction is limited to two categories of facilities: (1) facilities defined in Mental Hygiene Law § 1.03 and (2) other places that are required to have an OMH operating certificate. MHLS claims that defendant nursing homes fall within the designation "any other place or facility which is required to have an operating certificate pursuant to . . . [article 31 of the Mental Hygiene Law]." Article 31 of the Mental Hygiene Law vests OMH with the exclusive authority to issue operating certificates to facilities providing services to the mentally disabled. But not every facility that treats the mentally disabled requires an operating certificate from OMH. 14 NYCRR part 70 "establish[es] an all-inclusive set of categories, named *classes*, to which all providers of services to the mentally disabled subject to the requirement to obtain an operating

discharged from the program by any one of defendant nursing homes was August 16, 2004.

certificate" will be assigned (14 NYCRR 70.1 [a]). The Commissioner determines if a provider is subject to OMH licensure on the basis of three factors: "characteristics of the persons served, characteristics of the services provided, and the auspices of the provider of services" (14 NYCRR 70.1 [b]).

In support of their motion to dismiss the complaint, defendant nursing homes submit the deposition testimony of OMH's Director of Inspection and Certification that OMH did *not* have jurisdiction over defendant nursing homes and, as a result, OMH did not exercise any licensing jurisdiction. This decision was based, in part, on a site report prepared by OMH's field office.

In opposition, MHLS does not challenge OMH's authority to make a licensing determination, nor does it challenge OMH's decision not to license defendant nursing homes. MHLS claims OMH's decision not to require an operating certificate is of no import. Rather, MHLS argues that the dispositive issue is whether the facilities themselves are *subject to* licensing because they provide residential services to the mentally disabled.

But precisely which facilities are, in fact, subject to OMH licensure is a matter committed, in the first instance, to the Commissioner's discretion and expertise. Here, OMH decided that licensure was not required. Because only OMH is authorized to determine whether a facility is required to have an operating certificate and MHLS's jurisdiction is expressly limited to licensed facilities, MHLS has failed to raise an issue of fact. Thus, defendant nursing homes are entitled to summary judgment dismissing the complaint.

Finally, we express no opinion as to the correctness of OMH's decision underlying this case. The proper way to challenge any OMH licensure determination, however, is via a CPLR article 78 proceeding. At that time, OMH would be a party to the proceedings, allowing courts to review its determination on the full administrative record.

Accordingly, the order of the Appellate Division should be affirmed, without costs.

Chief Judge LIPPMAN. (dissenting). In 1993, Mental Hygiene Law § 47.01 (a) was amended with the express objective of extending the jurisdiction of the Mental Hygiene Legal Service (MHLS), the state agency legislatively assigned to act as counsel and advocate for the mentally disabled. That jurisdiction, formerly textually limited to persons in "hospitals, schools or

alcoholism facilities," or alleged to be in need of care in such institutions, was, pursuant to the amendment, significantly expanded to embrace a range of other in- and outpatient facilities, including community residences, group homes, intermediate care homes and family homes. It was the intent of the legislation's sponsors that the amendment, passed by unanimous vote of both houses of the Legislature, "would provide MHLS with the means to represent individuals without first having to establish jurisdiction because of their residence" (Senate Introducer Mem in Support, Bill Jacket, L 1993, ch 330, at 5). The need for the amendment, introduced at the request of the Administrative Board of the Courts, was explained at the time by Counsel to the Office of Court Administration, whose comments in support of the amendment (Bill Jacket, L 1993, ch 330, at 11-12) bear lengthy repetition here:

> "Confusion arises . . . with respect to MHLS services to persons in community residences, group homes, intermediate care homes and family care homes, all of which are places where services are rendered to patients with or without [the] benefit of a Mental Hygiene Law legal admission status. Currently there are more than 29,000 such patients; and they are in as much need of MHLS protective services, advice and assistance as persons who reside in hospitals and schools.

> "In actual practice, MHLS has considerable responsibilities towards these classes of patients. Without regard to type of facility or a person's lack of legal admission status therein, MHLS is involved in matters including but not limited to: applications for judicial authorization for medical treatment; surrogate decision making for medical treatment; transfers of patients; discharge planning; confidentiality and access to records; investigations of patient abuse; proceedings for appointments of conservators, committees and guardians; recommitment of forensic patients; restraint and seclusion; forced medication; assurance of quality care and protection of patients' rights in general; interstate transfer; and objections to treatment . . .

> "While most mental health professionals recognize the value of the services provided by MHLS to persons not having legal status, a few dispute their

authority to do so. In those instances, MHLS must first do battle to establish a jurisdictional foothold. Sometimes this may require litigation, which may be protracted and which may yield inconsistent results. The effect is that time will be lost and precious resources diverted away from the real needs of a class of persons who may truly require assistance."

This action seeking, among other relief, a declaration that MHLS is entitled to access to defendant nursing homes and the residents of those homes admitted for and being treated for psychiatric disorders was commenced by plaintiff Hirschfeld, the Director of MHLS in the Second Judicial Department, in June 2003. During the year prior, there appeared a Pulitzer Prize winning series of investigative newspaper reports focusing on the treatment of mentally disabled adults in state regulated facilities. One of the articles in this series, titled *Mentally Ill and Locked Up in New York Nursing Homes*, detailed what had evidently become a fairly widespread practice, if not a policy, countenanced, if not actively promoted, by the State, of discharging psychiatric patients from state psychiatric hospitals to discrete nursing home units, referred to as "neurobiological units" (NBUs), where they continued to receive psychiatric treatment in highly restrictive settings. The NBU placements were, according to the article, tantamount to involuntary psychiatric commitments without any provision for protection of the committees' liberty interests and rights to due process; whereas the legal rights of the affected individuals had been protected while they remained institutionalized in the Office of Mental Health (OMH) facilities pursuant to statutes providing, inter alia, for judicial review of involuntary commitments and for legal representation in matters pertaining to patients' liberty interests, the NBUs into which they had been discharged were not licensed by OMH and their residents were shorn of the legal protections they had had as patients in OMH licensed facilities.

After learning of the NBUs' existence in the public press, MHLS, in a letter signed by each of its directors, requested that defendant nursing homes afford its attorneys access to the NBUs and their residents. Counsel for the nursing homes, however, responded denying access upon the ground that the nursing homes were not OMH licensed facilities and did not fall within MHLS's jurisdiction.

Now, seven years later, MHLS is still without access to the mentally disabled residents of defendant nursing homes. That this should be so notwithstanding the 1993 enactment that was supposed to have settled the issue and to have obviated the need for the agency to engage in lengthy and costly litigation "to establish a jurisdictional foothold" in such facilities, is a most regrettable and unnecessary state of affairs, now justified upon an interpretation of the agency's jurisdictional statute (Mental Hygiene Law § 47.01 [a]) that is textually incorrect and plainly at odds with the purposes informing its enactment; it is, moreover, a reading that confuses judicial and administrative prerogatives with potentially devastating consequences for the representational rights and liberty interests of an acutely needy client population.

Mental Hygiene Law § 47.01 (a) states, in part:

> "The service shall provide legal assistance to patients or residents of a facility as defined in section 1.03[1] of this chapter, or any other place or facility which is required to have an operating certificate pursuant to article . . . thirty-one of this chapter, and to persons alleged to be in need of care and treatment in such facilities or places . . . ."

It is defendants' contention, now adopted by the majority, that this provision expressly limits MHLS's jurisdiction to facilities licensed by OMH. But the statute does not say that. What it does say is that the service shall provide assistance to patients or residents of facilities "required to have an operating certificate." If the Legislature had intended to limit the agency's jurisdiction to facilities that had been actually certificated by OMH, it could have and, doubtless, would have said so. It did not. There are compelling reasons why such a limitation should not be implied.

MHLS is a watchdog agency necessarily independent of OMH and, accordingly, situated in a separate branch of government,

---

**1.** Mental Hygiene Law § 1.03 (6), in turn, defines "facility," in relevant part, as:

> "any place in which services for the mentally disabled are provided and includes but is not limited to a psychiatric center, developmental center, institute, clinic, ward, institution, or building, except that in the case of a hospital as defined in article twenty-eight of the public health law it shall mean only a ward, wing, unit, or part thereof which is operated for the purpose of providing services for the mentally disabled."

namely, the judiciary. Its legislatively assigned mission is, at its core, to safeguard the basic liberty and due process rights of those institutionalized by reason of mental disability and those alleged to be in need of such institutional care. This mission routinely places the Service in an adversary relation to OMH. Whether in the context of representing individuals contesting involuntary commitment or treatment decisions by OMH personnel, or in advocating and sometimes litigating over quality of care issues, such as overcrowding or discharge planning, MHLS is regularly and unavoidably pitted against OMH and other providers of mental health services. It is neither seemly nor consistent with the Service's basic obligations to condition its jurisdiction upon administrative edicts by its constant, indeed structurally designated adversary.

Here, the record indicates that OMH has made a practice of discharging patients carrying primary, axis I, psychiatric diagnoses from its inpatient facilities to nursing homes, where, according to the patients' OMH discharge plans, they are to continue to receive a range of treatments primarily for psychiatric disorders. Discovery in this action has disclosed strong evidence that the treatment provided at defendant nursing homes to OMH's former patients is modeled upon OMH inpatient psychiatric care, and that the former OMH patients have been confined to units they are not free to leave. It has also disclosed, at least at the one defendant nursing home actually surveyed by OMH, highly unsatisfactory institutional conditions raising a host of properly legal issues.[2] Nonetheless, OMH has decided,

---

2. The OMH surveyor noted at the conclusion of what may be fairly characterized as a scathing assessment:

"1. Issues raised by the advocacy groups to the Office of Mental Health can be substantiated. These include the *de facto* placing of individuals with mental illness on a locked unit. There is a lack of advocacy/legal representation available to patients on these units.

"2. The majority of the patients in this facility are individuals with mental illness and therefore it appears that this constitutes a facility for the mentally ill.

"3. The programming lacks any rehabilitative or recovery oriented focus.

"4. Discharge planning did not reflect that the planner was aware of the wide variety of discharge options available.

"5. Restorative and rehabilitative services that were prescribed are all available at other more appropriate levels of care in the community."

evidently as a matter of agency policy, that it will not require defendant nursing homes to obtain operating licenses.

It is the majority's understanding that this administrative decision is presumptively conclusive of MHLS's right of access to the nursing homes at issue. It holds that OMH, although complicit in the creation of this highly problematic situation in which institutional psychiatric confinement and treatment is apparently perpetuated without any legal process or access by residents to advocacy, may effectively remove the situation and its likely victims from MHLS's jurisdiction and scrutiny by declining to require an operating license.

To cast OMH as arbiter of plaintiff's jurisdiction is inappropriate, not simply because OMH may well be—and here quite evidently is—conflicted in deciding the issue, but because it has no special expertise with respect to the essential object of the inquiry. There is no question that OMH is empowered and possesses expertise relevant to decide, at least in the first instance, whether a particular facility must obtain an operating license. But facility licensure is not the purpose of the jurisdictional statute here at issue; MHLS's jurisdiction—its right of access to facilities providing residential care and treatment for the mentally disabled—exists fundamentally, although not exclusively, to assure that there will in the context of commitment for mental disability be no infringement of liberty interests without due process of law. The inquiry, then, to be answered in determining the statute's range of application must in its most essential aspect be whether the facility or place at issue is one in which there is ongoing treatment for mental disability entailing on a regular basis the address of forensic issues implicating a patient's or resident's right to the assistance of counsel. It is not the role of health care administrators to determine when and where due process requires the presence and assistance of an attorney. That judgment is peculiarly within the competence and expertise of the judiciary. Thus, while it is undoubtedly highly and expressly relevant to the jurisdictional inquiry whether a place or facility is required to have an operating certificate pursuant to article 31 of the Mental Hygiene Law, that determination, for MHLS jurisdictional purposes, is not OMH's to make. It is in this unique context, when disputed, properly made by the courts with the jurisdictional statute's broad remedial purposes in mind.

OMH, of course, did not consider whether the residents of defendant nursing homes would have adequate access to counsel

when it decided that it would not require the homes to obtain operating certificates. The Director of OMH's Bureau of Inspection and Certification testified that certification of defendants was not required because it was OMH's policy not to require skilled nursing facilities to obtain OMH operating certificates; it was his understanding that those facilities fell within the licensing jurisdiction of the Department of Health (DOH). Under OMH's regulations, this might be a rational ground for an internal agency decision not to require an operating certificate (*see* 14 NYCRR 70.1 [b])—OMH might reasonably wish to not burden providers with multiple, overlapping certification requirements—but this administrative rationale does not speak to the jurisdictional issue framed by Mental Hygiene Law § 47.01 (a), which is not whether OMH has or has not required the nursing homes at issue to obtain operating certificates, but whether those providers are "required to have an operating certificate *pursuant to article . . . thirty-one of [the Mental Hygiene Law]*" (emphasis added).

Mental Hygiene Law § 31.02 (a) (1) flatly requires an OMH operating certificate for the "operation of a residential facility or institution, including a community residence, for the care, custody, or treatment of the mentally disabled." Nursing homes are "residential health care facilit[ies]" (Public Health Law § 2801 [3]), and where a nursing home provides custodial psychotherapeutic treatment of the mentally disabled there would appear to be no ground to conclude that it is not subject to OMH licensure, at least for purposes of determining the jurisdiction of MHLS. It may be that ordinarily nursing homes are licensed by DOH. But ordinarily nursing homes do not provide what amounts to involuntary inpatient psychiatric care and treatment of patients chronically afflicted with axis I psychiatric disorders. Moreover, there is absolutely no authority cited by defendants in support of the proposition that the licensing authority of DOH is exclusive of that of OMH. It would, to the contrary, seem clear that it was DOH's view that its licensees, to the extent that they provided residential psychiatric services, could be subject to OMH licensure and thus could be required to afford access to MHLS.[3]

---

**3.** DOH, it should be noted, supported MHLS's request for access to the NBUs, stating in a letter to the nursing facilities:

> "MHLS states, and this Department agrees, that MHLS is an agency of the New York State Court System, established by

Quite apart from the fact that OMH's decision not to require certification of defendant providers was not, and did not purport to be, based upon the criteria relevant in determining the reach of MHLS's jurisdiction, the treatment of its decision as an administrative determination somehow binding upon MHLS and, indeed, essentially preclusive of that agency's jurisdictional claim is contrary to very basic principles of law and procedural fair play.

It is elementary that "[d]ue process . . . would not permit a litigant to be bound by an adverse determination made in a prior proceeding to which he was not a party or in privity with a party" (*Gilberg v Barbieri*, 53 NY2d 285, 291 [1981]) and, accordingly, that a party may not be bound by an administrative determination that it has not been afforded the opportunity to oppose. The OMH decision at issue, reached by means of a cryptically described series of intra-agency conversations, was not one that MHLS or anyone else was afforded any opportunity to contest at the agency level. Indeed, the decision was not the product of any formal quasi-judicial or rule-making review process discernible from the record. Nor was it reduced to writing or publicized; it was apparently for internal purposes only and, in fact, only came to light in the course of this litigation's discovery phase.

It would be offensive to due process to deem anyone bound by a "determination" reached and publicized in such a manner. Here, however, the offense is compounded by the circumstance that the party deemed bound is an independent state agency whose jurisdiction has, in consequence of the "determination," been restricted in a manner incompatible with its legislatively assigned mission and with the clear import and intent of the governing jurisdictional statute. This "determination" does not command deference, and particularly not the extreme, practically talismanic deference it is now given. I would have thought

---

Mental Hygiene Law (MHL), Article 47. MHL § 47.03 (d) provides that MHLS shall be granted access at any and all times to any 'facility' or place or part thereof. For this purpose, MHL § 1.03 (6) defines 'facility' in the case of a hospital as defined by Public Health Law, Article, 28 to include a ward, wing, unit or part thereof which is operated for the purpose of providing services to the mentally disabled. A nursing home is a hospital within the meaning of Article 28 of the [P]ublic [H]ealth [L]aw.

"This Department agrees that the MHL provides that MHLS is to have access to such facilities [NBUs], including, to the extent applicable, yours."

it clear that courts could not upon such a ground determine any rights, much less cede to bureaucrats the peculiarly judicial prerogative to determine when and where counsel is required in defense of basic liberty interests. It should be self-evident that decisions as to the availability of counsel for mentally disabled persons faced with critical choices, and in some cases possible state compulsion in matters respecting their liberty and personal integrity, should not be made as a result of internal agency conversations by health care administrators. Those decisions are properly the function and obligation of the judicial branch. Obviously, the Legislature in enacting the 1993 amendment expressly expanding MHLS jurisdiction to include all facilities and places "required to have an operating certificate pursuant to article . . . thirty-one of [the Mental Hygiene Law]" had not the slightest intention to commit this essentially judicial task to the Commissioner of Mental Health.

Judges GRAFFEO, READ and SMITH concur with Judge PIGOTT; Chief Judge LIPPMAN dissents in a separate opinion in which Judges CIPARICK and JONES concur.

Order affirmed, without costs.