[994 NYS2d 781]

In the Matter of LAURENCE GUTTMACHER, M.D., Clinical Director of the Rochester Psychiatric Center, Petitioner, for an Order Authorizing the Involuntary Treatment of J.W., a Patient at Rochester Psychiatric Center, Respondent.

Supreme Court, Monroe County, July 17, 2014

### APPEARANCES OF COUNSEL

*Eric T. Schneiderman, Attorney General* (*Hillel Deutsch* of counsel), for petitioner.

*Mental Health Legal Service* (*Craig S. Levin* of counsel) for respondent.

### OPINION OF THE COURT

RICHARD A. DOLLINGER, J.

In this case, the State seeks to medicate a man held at the Rochester Psychiatric Center (RPC). In support of the application, the State introduced a Rochester-based psychiatrist, who was a non-board-certified forensic psychiatry fellow. The patient had been arrested on a family offense petition and declared incompetent to stand trial. Remitted to the custody of RPC, the patient had refused certain medications and his treating psychiatrist petitioned the court to permit administration of the medications over his objections.

In the initial petition to this court, the psychiatrist provided a written "Evaluation for Treatment over Objection" (the evaluation), in which the doctor detailed that his diagnosis of the patient was "psychosis not otherwise specified" and "possible schizophrenia, paranoid type, chronic." The written evaluation also documents what the patient told the doctor about his objection to treatment: "I am not a medication person. Medications mess me up. I am competent, I am fine, just discharge me." The evaluation describes why the patient was incapable of making a reasoned decision regarding his treatment. The psychiatrist checked the box indicating that the "patient does not appear to understand his/her conditions or proposed benefits, risks or

alternatives of proposed treatment." After this language, the evaluation form suggests to the evaluator a series of patient responses that would justify this conclusion, including "patient was mute, made irrelevant comments, patient stated that voices are real and medication will poison them."[1] Significantly, the evaluation ends with a conclusion by the psychiatrist that the patient was "potentially dangerous to other[s]" and further stated that the basis for this opinion was "[the patient] threatened his family and other people in his town before his arrest. His wife and son have [an] order [of] protection against [him]."

The psychiatrist testified that he had been the 47-year-old patient's treating psychiatrist for nearly three months. The doctor testified that he had not reviewed the patient's medical or psychiatric records prior to his confinement at RPC because the patient had declined to make them available. When the patient arrived at RPC, the patient took medications, but later refused. He participated in group sessions, but refused to share information with RPC officials. While he initially improved, he regressed, becoming, in the psychiatrist's words, "extremely paranoid." The doctor recommended treating the patient with antipsychotic medications. If the drugs were administered, the prognosis was fair to good; without them, the doctor testified, the prognosis was "poor." He then described an increasing use of medications if the patient were unresponsive. He testified that the drug therapy would address his symptoms, claiming he was "very argumentative," "threatening" and "getting into legal trouble." The alleged threats were directed against the doctor and originated, according to the doctor, because the doctor had told the patient that he would medicate him over his objection. The doctor was the only witness for RPC. The patient did not testify.

In order to sustain this petition, the State must prove by clear and convincing evidence that: (1) the patient lacks the capacity to make a reasoned decision with respect to proposed treatment; and (2) the proposed treatment is narrowly tailored to give substantive effect to the patient's liberty interest, taking

---

1. In contrast to these statements on the form, the doctor, in his testimony, never suggested the patient was mute, never suggested he made irrelevant comments, never testified that the patient heard voices and, while the patient suggested to the doctor the medications would "mess up his mind," this comment—which was somewhat justified because the medications would alter his mood and temperament—is hardly equivalent to the suggestion that the proposed medications would "poison" him.

into consideration all relevant circumstances, including the patient's best interests, the benefits to be gained from the treatment, the adverse side effects associated with the treatment and any less intrusive alternative treatments. (*Rivers v Katz*, 67 NY2d 485, 497 [1986] [the *Rivers* test].) The question of "[w]hether a mentally ill patient has the capacity to make a reasoned decision with respect to treatment is a question of fact." (*Matter of William S.*, 31 AD3d 567, 568 [2d Dept 2006].)

In addition, the burden imposed on the State, in seeking to medicate this patient over his objection, is a heavy one. The clear and convincing standard "means evidence that is neither equivocal nor open to opposing presumptions." (*Solomon v State of New York*, 146 AD2d 439, 440 [1st Dept 1989]; *Smith v State of New York*, 24 Misc 3d 1234[A], 2009 NY Slip Op 51744[U] [Ct Cl 2009].) The standard is significant and a higher and more demanding standard than preponderance of the evidence, as it serves to impress the factfinder with the importance of the decision. (*Matter of Storar*, 52 NY2d 363, 379 [1981] [this higher than preponderance standard " 'forbids relief whenever the evidence is loose, equivocal or contradictory' "]; *Matter of Poldrugovaz*, 50 AD3d 117, 127 [2d Dept 2008] ["a party who must establish (his, her) case by clear and convincing evidence must satisfy (the trier of fact) that the evidence makes it highly probable that what (he, she) claims is what actually happened" (citing NY PJI 1:64)]; *Colorado v New Mexico*, 467 US 310, 316 [1984].)

Against this backdrop of legal precedent, the State has a high hurdle to cross in this case. At the commencement of the hearing, the patient's counsel objected to the doctor's testimony, arguing that he was not a board-certified psychiatrist and hence could not offer an opinion on the patient's status, need for treatment over his objection and the consequences of that treatment on him. The court overruled the objection and permitted the testimony. There is no requirement in New York that board certification is a prerequisite to the testimony of a treating physician or psychiatrist. (*People v Surdis*, 77 AD3d 1018 [3d Dept 2010].) The admissibility of expert testimony lies within the sound discretion of the hearing court and should be admitted if the witness possesses sufficient education, training and experience from which the court infers that the opinion would be reliable. (*People v Menegan*, 107 AD3d 1166 [3d Dept 2013]; *People v Geraci*, 254 AD2d 522 [1998].) As a component of establishing a witness' credentials and training, the New York courts have

looked favorably on board certification in evaluating a physician's credentials. (*See Finkenagel v Perry*, 2014 NY Slip Op 31728[U] [Sup Ct, Suffolk County 2014] [suggesting that board certification would be a factor in determining expert status]; *M.M. v L.M.*, 42 Misc 3d 1235[A], 2014 NY Slip Op 50370[U] [Sup Ct, NY County 2014] [witness tabbed as an expert, a board-certified psychiatrist, court appointed forensic evaluator and retained as an expert in more than 40 cases, qualified as an expert]; *but see Matter of State of New York v Junco*, 16 Misc 3d 327 [Sup Ct, Washington County 2007] [qualified as an expert in psychiatry, but not as a forensic psychiatrist, permitted to testify only to opinions in psychiatry for which he was board certified].) While certainly favoring witnesses with board certification in specialities, the New York courts have no absolute rule that would preclude a non-board-certified physician from providing expert testimony.

Based on these criteria, the proffered expert's lack of board certification in this case—or even his claim to be a "specialist"—does not defeat his status as an expert, if he has adequate training, education and experience. A physician need not be a specialist in a particular field in order to qualify as a medical expert. (*Bodensiek v Schwartz*, 292 AD2d 411 [2d Dept 2002]; *Erbstein v Savasatit*, 274 AD2d 445 [2d Dept 2000].) The New York courts, in evaluating an expert, have relied more on proof of training and experience than board certification in determining the scope of expert testimony permitted by a physician. The Second Department intoned:

> "The appellants' contention that the plaintiff's expert, a board-certified obstetrician/gynecologist surgeon, was unqualified to give an expert opinion on the standard of care of an obstetrician/gynecologist oncologist surgeon merely because he was not an oncologist, is without merit. . . . Rather, any alleged lack of knowledge in a particular area of expertise is a factor to be weighed by the trier of fact that goes to the weight of the testimony."
> (*Walsh v Brown*, 72 AD3d 806, 807 [2d Dept 2010]; *Texter v Middletown Dialysis Ctr., Inc.*, 22 AD3d 831 [2d Dept 2005].)

The Fourth Department followed suit in *Diel v Bryan* (71 AD3d 1439 [4th Dept 2010]), expanding the scope of an expert's permissible opinion even though the witness was not board certified in the particular care at issue. The Court rejected the contention of defendant that plaintiff's expert witness, a board-

certified anesthesiologist, was not qualified to testify concerning the standard of care to be applied in evaluating defendant's care and treatment of decedent with respect to the administration of anesthesia during a dental procedure. (*Id.*)

■ For these reasons, the court admits the testimony of the treating psychiatrist in this case as one of the two expert opinions that establish the basis for the court-ordered medication requirements in this case.[2]

However, while the treating psychiatrist's opinion was admitted, this court concludes that the State has failed to prove by clear and convincing evidence that this patient lacks the capacity to make a reasoned decision regarding his own medical treatment. In cross-examination, the doctor admitted that this case represented his first time testifying in a medication case. The first-time expert witness encountered some difficulties in articulating that the patient was incapable of making his own decisions. First, the treating physician, in what is otherwise a usually-scripted question, equivocated on a critical point. When asked by the RPC counsel under direct examination, whether the patient had a "capacity to make a reasoned decision regarding the proposed treatment," the doctor answered "yes." Obviously surprised by the answer, the attorney retraced his steps, bifurcated the question and the doctor changed his answer to "no." While the court could easily conclude that this slip—even on a question central to the government's case—could be an understandable case of first-time testimony jitters, the remaining portion of his testimony gives this court little confidence to reframe his first answer—"yes, he does have the capacity" to make decisions—into a convincing "no he does not." The equivocation on this critical issue tarnishes the government's attempts to meet its burden by clear and convincing evidence.

Second, in response to an inquiry from the court, the doctor appeared less than assured about his diagnosis of the patient as a paranoid schizophrenic. The doctor used the phrase "possible schizophrenic," but when pressed by the court he could not give a more definitive diagnosis. There is no evidence in the record of this case that "possible schizophrenia" is a mental disease or defect or that the "possible schizophrenia" condition impairs a patient's ability to make his own medical decisions.

---

**2.** A second psychiatrist offered a written assessment of the patient which nearly matched the analysis of the testifying psychiatrist, but the second doctor did not testify.

Third, the doctor offered a diagnosis that the patient suffered from paranoia. However, when asked for evidence of this paranoia, the psychiatrist testified that the patient had repeatedly refused to give information to the psychiatrist including declining to make his previous medical records available or allowing the doctor to discuss matters with his family. The doctor admitted that the patient could logically and reasonably be within his rights and refuse to provide such information. The doctor admitted that the patient has no legal obligation to make his medical records available and neither was he required to allow the physician to speak with his family. However, the psychiatrist interpreted that failure by the patient to give information to his treating psychiatrist as a form of paranoia. In this court's view, a patient has a right to decline a request for the release of his prior medical records. In his dissent in *Hirschfeld v Teller* (14 NY3d 344, 350 [2010]), Chief Judge Lippman noted, in a point not controverted by the majority, that mental health patients had an assortment of rights including "confidentiality and access to records."[3] In *Matter of Grand Jury Investigation in N.Y. County* (98 NY2d 525, 532 [2002]), the majority of the Court confirmed the importance of the "confidentiality of [a patient's] medical records." The New York Public Health Law provides a patient with control over their medical records. (Public Health Law § 2803-c [3] [f] [assures "confidentiality in the treatment of personal and medical records"].) Given the strong public policy favoring a patient's right to control his own records, it is difficult to conceive that a patient—who asserts such a right—would find that his treating psychiatrist considers his assertion of that right as evidence of paranoia.

Fourth, the court declined to permit the doctor to testify to information provided to him by members of the patient's family. As evidence of the patient's paranoid diagnosis, RPC's counsel attempted to elicit from the doctor testimony that the patient's refusal to allow the doctor to communicate with his family—or to provide access to medical records—was evidence in support of the diagnosis. At one point, the following colloquy occurred:

> "THE COURT: Is there a suggestion on RPC's part, on this witness's part that if someone doesn't allow access to their medical records they are paranoid? Is that the point we're trying to make here?

---

**3.** In his dissenting opinion, Chief Judge Lippman quoted from a memorandum in support of a legislative amendment to the Mental Hygiene Law. (Bill Jacket, L 1993, ch 330, § 3, amending Mental Hygiene Law § 47.01 [a].)

"RPC COUNSEL: That's what I'm going to ask the doctor."

Based on the patient's refusal to grant access to his records or his family, the doctor concluded that he had been suffering from the "symptoms of paranoia for the last three years." To further support that diagnosis, RPC's counsel also sought to introduce a letter from the patient's sisters, written more than two years ago which described his condition. The letter was excluded in response to a hearsay objection, as it represented the out-of-court statements of nonparty witnesses who were not experts in psychiatry and there was no testimony that this letter was the type of out-of-court statement that a psychiatrist would normally utilize in his professional diagnosis. (*See Matter of State of New York v Motzer*, 79 AD3d 1687, 1688 [4th Dept 2010] [an expert witness may provide opinion evidence based on otherwise inadmissible hearsay, provided it is demonstrated to be the type of material commonly relied on in the profession]; *see also Matter of State of New York v Floyd Y.*, 22 NY3d 95, 106 [2013] [there is measurable value to a requirement that experts only introduce evidence that bears independent indicia of reliability and sufficient probative value].) When the letter was excluded, RPC's counsel sought to introduce evidence that a meeting had occurred between the doctors and the patient's sisters in which they recounted certain behaviors—although the doctor could not identify when they occurred—and the doctor testified that the sisters told him "he has been getting worse for the last three or four years." In response to an objection by the patient's counsel, the following colloquy occurred:

"RPC COUNSEL: Your Honor, let's take a step back there and examine that [the doctor] is an expert and it's his responsibility to evaluate the information that comes in. And it's also his responsibility as an expert to give weight accordingly. And the things that he considers in making his diagnosis are relevant to this court.

"THE COURT: And you would suggest that the comment of a non-trained third party who says he's gotten worse over the last three [years] is something that this doctor can rely on in formulating his expert opinion?

"RPC COUNSEL: I'm saying that the doctor has the right to give weight to that, and the doctor absolutely can say if somebody comes in and says I observed X, Y, and Z, I can't call that person to the

stand for the medical relevance of that, but I can certainly ask [the doctor] his belief—

"THE COURT: That's not why I excluded it. I didn't exclude it because he couldn't describe the behaviors. I excluded it because it contains the suggestion that he had been getting worse. If it's a description of his behavior, that he may be able to rely on. What he can't rely on is, it seems to me, is a suggestion by someone that we thought he was getting worse, right?

"RPC COUNSEL: I agree with that, your Honor.

"THE COURT: That's why I excluded that portion of the testimony.

"RPC COUNSEL: Let me phrase the question this way. Were there any specific behaviors described that had taken place either during his retention or immediately before his retention?

"PATIENT'S COUNSEL: Your Honor, I'm going to object to that. The doctor certainly can use that in his diagnosis. But, to say it in open court I would still submit it's hearsay. If he wants to use it with regards to why he diagnosed my client as he did, fine. He can use that. But, to say it in open court I would submit it's prejudicial and hearsay.

"THE COURT: This is where—I disagreed with [RPC Counsel], I'm going to disagree with you, [patient's counsel]. He can testify to incidents that are described by third parties as a factor in his expert judgment. What I have to decide is whether that expert judgment, if based on those incidents which are not corroborated by other parties in this room, is entitled to weight before this court. I can allow him to testify to what he considered, and I will decide whether there's appropriate—whether I should give appropriate weight to his expert opinion based on those third party events.

"Based on your conversation with [the patient's] two sisters, did they describe any specific incidents which occurred during or immediately before his retention at RPC?

"DOCTOR: They related his most recent arrest due to his paranoid behavior.

"THE COURT: I'm going to strike that portion of it that says due to his paranoid behavior. Strike it.

That's the one thing the sisters can't testify to. They are not experts."

Because the doctor's opinion was based, in part, on a hearsay statement by a witness who did not appear at trial and was based in part on that non-expert witness' characterization of the patient, the testimony was excluded. This court, in seeking guidance on the admissibility of this testimony, relies on the Court of Appeals determination in *State v Floyd Y.*, which in a comparable proceeding, held that a two-step analysis—is the hearsay reliable and does its probative value outweigh its prejudicial value—should determine whether this testimony is accepted.[4] (22 NY3d at 109.) The Court warned trial judges that these requirements prevent an expert "from serving as a passive conduit" for hearsay. (*Id.*) This court, by excluding the hearsay testimony of the patient's family as conveyed through the doctor, adopts what the Court of Appeals has suggested is the better course: requiring live confrontation of the declarant to ensure the statement's reliability. (*Id.*) Because none of the patient's family appeared and there was no evidence that these sisters' statements would be part of evidence on which a psychiatrist would usually rely in forming his professional opinion, this court excludes consideration of this portion of the doctor's testimony and declines to credit this portion of the doctor's opinion.

Fifth, in another instance, the doctor testified, as part of his diagnosis, that the patient had delusions. When probed under questioning, the doctor testified that the only evidence of such delusions was that patient would say, "you do not know who I am" and "only my wife can know." The doctor, under cross-examination, rejected the notion that such a statement was simply argumentative, claiming instead it was evidence of "delusions." In this court's view, the patient's stubborn insistence on not communicating with his doctor and refusing to divulge his past can hardly be considered delusional.

Sixth, as for evidence of his paranoia, the doctor testified that the patient's refusal to take medication or participate in certain

---

**4.** The proceeding in *State v Floyd Y.* was a sex offender confinement proceeding under the Mental Hygiene Law. (Mental Hygiene Law §§ 10.03 [e]; 10.07 [f].) The Court of Appeals held that the due process protections under the Fifth and Fourteenth Amendments apply in that setting, requiring application of the *Mathews* test. (*Mathews v Eldridge*, 424 US 319 [1976].) In this court's view, the same type of liberty interest implicated in *State v Floyd Y.* is present here: the State seeks to medicate an individual over his objection. Therefore, the "reliability" analysis expounded in *State v Floyd Y.* should govern the admissibility of evidence in this proceeding as well.

types of treatment were evidence of his paranoia. But, the doctor also acknowledged that the patient had no difficulties in his daily life activities and his only evidence of any difficulty in his daily routine was that he was "argumentative and unpleasant." There was no evidence of any inappropriate behavior in group settings or hallucinations.[5] The patient was eating and sleeping and abided by the facility rules, except in refusing medications.

Seventh, the doctor predicted that without taking the medications, the patient may become more aggressive, but when pressed, he admitted that he had no information or evidence that might support this conclusion. The only improvement that he testified would occur if the medications were administered was that the symptoms of "aggressiveness" that the family had described would improve: the patient would become less argumentative and nothing else.

Eighth, the court inquired about the reasonable forecast for the patient's behavior if the court denied the application. The doctor said he could not respond with certainty, but added that "he will be more likely to continue his argumentative behavior with others." Importantly, the doctor testified that the patient was not currently a threat to anyone and was not a threat to himself. When quizzed in detail both by the patient's attorney and the court, the doctor admitted that he had no firsthand proof that the patient was dangerous to others. He testified under cross-examination that the patient had not engaged in physical contact with anyone, including other patients and had never been restrained or given medications to calm him. In the final cross-examination, the doctor admitted that while he had, in the written evaluation, concluded that the patient was a danger to others, it was based solely on the pending family offense dispute and order of protection in a nearby town court.

█ In this court's view, the proof offered in this case fails to meet the clear and convincing standard that the patient lacked the capacity to make a reasoned decision regarding his medical

---

**5.** In the written clinical earlier signed by the doctor and submitted with the petition in this case, the doctor stated that the patient had a "clear history of acting bizarre (talking in colors)" but he never described that condition during his examination. The same evaluation notes the patient's "tangential and circumstantial speech" and a "thought process that is illogical and preservative." The doctor never attested to those conditions during his direct examination either and, having heard nothing about these conditions during his testimony, the court declines to credit them. If they were important in the doctor's diagnosis, he would, no doubt, have repeated them in his testimony before the court.

care. The proof, even if the doctor's testimony is fully credited, is too "loose and equivocal." The patient was, under the most favorable view of the government's proof, stubborn, argumentative and upset at his confinement. He was, in this court's view, noncooperative and perhaps overly protective and secretive. He harbors grievances against family members who, in his view, participated in his confinement at RPC. He resents his doctor's intrusion into his life and opposes his doctor's recommended drug therapies. But, there is insufficient clear and convincing evidence that the patient is schizophrenic or paranoid to a degree that prevents him from making a reasoned decision about his medical care or taking antipsychotic drugs, as the government wishes to do over his objection. Having concluded that the government has failed to establish the first requirement of the *Rivers* test, the court need go no further.

The application, based on the proof before this court after the hearing, is denied.